COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West-Plaza One
250 Pehle Ave., Suite 401
Saddle Brook, NJ 07663
Telephone:  201/845-9600
201/845-9423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICKY DUDLEY, Individually and On Behalf of All Others Similarly Situated, ) ) ) | No. |
| Plaintiff, ) ) ) | |
| vs. ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| CHRISTIAN W. E. HAUB, ERIC CLAUS, BRENDA M. GALGANO, ANDREAS GULDIN, RON MARSHALL and SAMUEL MARTIN, ) ) ) ) ) | |
| Defendants. ) ) | **JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

This is a federal securities class action brought by the Plaintiff, Ricky Dudley residing at 179 Community Drive Goldsboro, NC  27530 on behalf of purchasers of the securities of The Great Atlantic & Pacific Tea Company, Inc. ("A&P" or the "Company") between July 23, 2009, and December 10, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

1.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

3.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  A&P maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including,

but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Ricky Dudley, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of A&P during the Class Period and has been damaged thereby.

6.     A&P maintains its chief executive offices and principal place of business at 2 Paragon Drive, Montvale, NJ 07645.  A&P was founded in 1859 and currently operates conventional supermarkets, combination food and drug stores, and discount food stores.  The Company's stores offer grocery products that include grocery, frozen foods, dairy, general merchandise/health and beauty aids, wine, beer, spirits, and pharmacy products; meat products, which comprise meat, deli, bakery, and seafood; fresh produce that consists of produce and floral, as well as on-site banking services. As detailed herein, A&P has filed for protection under the bankruptcy code and for that reason is not named as a defendant in this action.

7.     Defendant Christian W. E. Haub ("Haub") served as Executive Chairman and Chairman of Executive Committee of the Board of Directors of the Company during the Class Period.  Defendant Haub is also Co-Chief Executive Officer of Tengelmann Warenhandelsgesellschaft KG ("Tengelmann"), a German multinational investor, that owned and/or controlled at least 38.6% of the Company's shares during the Class Period.

8.      Defendant Eric Claus ("Claus") served as President and CEO of the Company during the Class Period until he resigned from that position on October 20, 2009.

9.      Defendant Brenda M. Galgano ("Galgano") served as Chief Financial Officer, Senior Vice President and Treasurer of the Company during the Class Period.

10.      Defendant Andreas Guldin ("Guldin") served as Vice Chairman, Chief Strategy Officer - - reporting directly to defendant Haub - - and Chairman of the Finance Committee and Member of the Executive Committee of the Board of Directors of the Company during the Class Period.  Defendant Guldin was appointed to these positions (after joining the Company in May 2007 as Executive Managing Director, Strategy & Corporate Development and a member of the Board of Directors of the Company), immediately following the resignation of Eric Claus, as President and Chief Executive Officer of the Company, on October 20, 2010.  Defendant Guldin was also Senior Executive Vice President (Corporate Finance) and Co-CFO of Tengelmann, a role which he held from July 2005 until April 2007, and during that time he also served as an advisor to the Company's Executive Chairman and Board of Directors, and was lead negotiator and was instrumental in closing the acquisition of Pathmark Stores, Inc. ("Pathmark").

11.      Defendant Ron Marshall ("Marshall") served as Chief Executive Officer and President of the Company, having assumed this position on or about February 8,

2010.   Prior to A&P's acquisition of Pathmark, defendant Marshall served as Executive Vice President and Chief Financial Officer of Pathmark.

12.     Defendant Samuel Martin ("Martin") served as Chief Executive Officer and President of the Company, having assumed this position on or about July 23, 2010, following the unscheduled departure of defendant Marshall.

13.     The defendants referenced above in ¶¶8-13 are referred to herein as the "Individual Defendants."

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of A&P securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding A&P's business, operations, management and the intrinsic value of A&P securities; (ii) enabled defendants to artificially inflate the price of A&P securities; (iii) enabled A&P to sell over $430 million of debt on favorable terms; and (iv) caused plaintiff and other members of the Class to purchase A&P securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of A&P between July 23, 2009, and December 10, 2010, inclusive (the "Class") and who were damaged thereby.

Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, A&P common shares were actively traded on the New York Stock Exchange and the Company had more than 50 million shares of common stock issued and outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by A&P or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of A&P; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     A&P was founded in 1859 and currently operates conventional supermarkets, combination food and drug stores, and discount food stores.

22.     The Class Period begins on July 23, 2009.  On that date, A&P issued a press release announcing its financial results for the fiscal first quarter of 2009, ended

June 20, 2009.  In addition, the Company announced a "Major Investment Agreement," which was supposed to "strengthen [the Company's] balance sheet and have significantly increased liquidity available to pursue its business strategy thereby better positioning the Company to compete in the dynamic food retail industry."  The release stated, in pertinent part, the following:

> MONTVALE, N.J. - July 23, 2009 - The Great Atlantic & Pacific Tea Company, Inc. (A&P or the Company) (NYSE:GAP) today announced the execution of investment agreements between the Company and affiliates of The Yucaipa Companies, LLC ("Yucaipa"), and partners of Tengelmann Warenhandelsgesellschaft KG ("Tengelmann") whereby Yucaipa will invest $115 million and Tengelmann will invest $60 million for a total purchase of $175 million of convertible preferred stock pursuant to a private offering.
>
> **With these new funds, A&P will be able to strengthen its balance sheet and have significantly increased liquidity available to pursue its business strategy thereby better positioning the Company to compete in the dynamic food retail industry.**  Under the terms of their agreements, Yucaipa and Tengelmann will purchase 115,000 and 60,000 shares of convertible preferred stock, respectively, each with an initial liquidation preference of $1,000.  On a fully diluted basis, Tengelmann will remain the largest single shareholder with an ownership interest of 38.6 percent, with Yucaipa's ownership interest increasing to 27.6 percent.  In connection with the preferred stock investment, A&P's Board of Directors will be comprised of the nine current directors plus two additional directors nominated by Yucaipa.  [Emphasis added.]

Commenting on this transaction, defendant Haub as well as the Company's former President and CEO, Eric Claus, each stated, in pertinent part, as follows:

> According to Christian Haub, Executive Chairman, A&P, and Co-Chief Executive of Tengelmann, "This investment further solidifies Tengelmann's over 30 year commitment to the Company's success. Partnering with Yucaipa is an exciting opportunity to collaborate with one of the most successful investors in the supermarket industry, Ron

> Burkle. **We believe this strategic partnership has the potential to unlock significant shareholder value and I look forward to working with Ron to make this a reality."**
>
>         \*      \*      \*
>
> "This deal reconfirms Tengelmann's long-standing commitment to this Company and our strategic plans.  The addition of Yucaipa as a significant investment **partner provides the necessary resources to successfully execute our strategies and navigate through this difficult economy effectively with a focus on building sustainable profitability in the longer-term**," said Eric Claus, President and CEO of A&P. [Emphasis added.]

Regarding the Company's fiscal first quarter 2009 results, the press release stated, and again quoted defendant Haub and former CEO Claus, stating, in pertinent part, as follows:

> The Company also released its fiscal 2009 first quarter results for the 16 weeks ended June 20, 2009.  Sales for the first quarter were $2.8 billion versus $2.9 billion last year.  Comparable store sales decreased 3.3%. For the first quarter, excluding non-operating items, adjusted EBITDA was $80 million versus $96 million last year.  Adjusted income from operations was $2.3 million versus $16.2 million in last year's first quarter…. Reported loss from continuing operations was $58.3 million compared to income of $2.8 million for last year's first quarter.
>
>         \*      \*      \*
>
> [Claus stated,] We continue to see year-over-year increase in segment income within our Fresh, Gourmet and Discount businesses.  Our Price Impact or Pathmark stores continue to be a challenge with year-over-year decline in segment income, driven by negative comparable store sales and lower gross margins, primarily resulting from higher promotional spending and price investments.  **Although, in the shorter term, this has negatively impacted our earnings, we believe this strategic pricing investment will well-position us to generate long-term growth overtime and once the overall economy improves**."

"The current challenging economy continues to impact our business. However, we are confident that our business optimization initiatives supported by our strategic investment agreements will benefit the Company and allow us to mitigate some of the difficulties we are experiencing.  We are working on improving our results in revenues driven by our promotional and pricing strategies as well as decreased costs through greater efficiencies in labor and distribution while also benefiting from increased private label penetration and lower stock losses during the remainder of fiscal 2009," stated Christian Haub, Executive Chairman, A&P.  [Emphasis added.]

23.    In response to the announcements, the price of A&P common stock traded almost 15% higher, closing at $5.33 per share, compared to the prior day's close of only $4.65 per share on extremely heavy trading volume.

24.    On July 23, 2009, A&P filed a Form 10-Q for the quarter ended June 20, 2009, with the SEC which was certified by defendants Claus and Galgano.  In addition to making substantially similar statements concerning the Company's operations and financial stability as had been published previously.

25.    The statements referred to above in ¶¶23 and 25 were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)    that A&P was facing increased low-cost competition from retailers such as Wal-Mart and Target Corp., which was negatively impacting the Company's business and financial condition;

(b)    that the Pathmark acquisition was a complete disaster for the Company as Pathmark's operations were in far worse condition than had been represented to investors;

(c)    A&P was not operating according to internal expectations and could not achieve the guidance sponsored and/or endorsed by defendants; and

(d)    based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company, its operations and prospects.

26.    Taking advantage of the artificial inflation in the price of the Company's securities, caused as a direct result of the publication of defendants' materially false and misleading statements, defendants immediately announced a proposed offering of an additional $225 million of senior secured notes.  Later, on July 30, 2009, when the notes were priced, at 11.375%, as a result of strong demand, the principal amount was raised to $260 million, as compared to the $225 million announced previously.

27.    On August 4, 2009,  A&P issued a press release representing that the capital it had raised would "significantly strengthen" the Company as well as "accelerate" the turnaround of its Pathmark operations.  In addition, this release quoted defendant Haub, in part, as follows:

> The Great Atlantic & Pacific Tea Co. Completes $435MM Capital Raising Effort
>
> New Capital Significantly Strengthens A&P and Brings Together Two Prolific Investors in the Supermarket Industry

A&P to Accelerate Format Optimization, Business Improvement
Initiatives and Pathmark Turnaround

\*      \*      \*

"Working together with Yucaipa is an exciting opportunity to collaborate
with one of the most successful investors in the supermarket industry.  I
have enjoyed a productive relationship with Ron Burkle for many years
and **I believe that together we will drive significant performance
improvement in the business and realize the tremendous potential
and strategic value of A&P**" said Christian Haub, Executive Chairman,
A&P and Co-Chief Executive of Tengelmann.  [Emphasis added.]

28.    On October 20, 2009, A&P issued a press release announcing results for

the fiscal second quarter of 2009, ended September 12, 2009.  This release stated, in

pertinent part, as follows:

Sales for the second quarter were $2.1 billion versus $2.2 billion last
year.  Comparable store sales decreased 3.8%.  For the second quarter,
excluding non-operating items, adjusted EBITDA was $64 million
versus $67 million last year.  Adjusted income from operations was $6.0
million versus $6.3 million in last year's second quarter.  The non-
operating items excluded from adjusted income from operations are
listed on Schedule 3 of the press release and adjusted EBITDA is
reconciled to net cash from operating activities on Schedule 4.  For the
second quarter, reported loss from continuing operations was $62.2
million compared to a loss of $4.3 million last year, which includes a
$50.0 million increase in non cash mark to market adjustments related to
financial liabilities.

The press release also repeated that Eric Claus, the President and CEO of the

Company, had resigned his position.  Commenting on these results and upon the

departure of Claus, this release stated, in pertinent part, as follows:

The current challenging economy continues to impact our business.  The
macro headwinds including rising unemployment, intensifying price
competition and now also deflation are creating an even more difficult

- 11 -

short-term economic environment. **Nonetheless, we have made progress in several of our formats and many of our initiatives.**

\*     \*     \*

**Securing over $400 million in new funds was clearly done at the right time to ensure that we have the resources to address future debt maturities and to invest in our optimization strategies**. In addition our working relationship with Yucaipa is off to a great start as we continue to look at ways to improve our overall business strategy.

We believe that once the economy improves **these strategies will position us well to realize the tremendous strategic value of the company and to capitalize on our leadership position in the Northeast**. [Emphasis added.]

29.     On, January 12, 2010, A&P issued a press release announcing its fiscal results for the fiscal third quarter of 2009, the period ending December 5, 2009.  In addition to announcing a sudden "impairment charge" of almost $413 million, this release stated, in part, the following:

Sales for the third quarter were $2.0 billion versus $2.1 billion last year. Comparable store sales decreased 5.8%.  For the third quarter, excluding non-operating items, adjusted EBITDA was $36 million versus $78 million last year.  Adjusted loss from operations was $20.1 million versus adjusted income from operations of $17.4 million in last year's third quarter…. **For the third quarter, reported loss from continuing operations was $502.4 million which includes charges of $412.6 million for goodwill, trademark and long-lived asset impairment and $16 million for mark to market adjustments related to financial liabilities**.  Loss from continuing operations in the comparable period of the prior year totaled $3.8 million, and included income of $23 million for mark to market adjustments related to financial liabilities.

Defendant Haub, commented on the announcement stating, in pertinent part, as follows:

- 12 -

**Since assuming the role of interim CEO, I have launched efforts to assess all aspects of our business and to develop initiatives to improve our performance in the short term.** During this important process, we have been fully engaged with Yucaipa and have leveraged their significant skills and industry expertise. We have determined that our previous merchandising and marketing programs did not meet the consumer's changing needs. As a result, **we have been changing our go-to-market direction and implemented a number of initiatives to mitigate the negative external influences and provide our customers with better value, service and quality products.**

**This quarter marks the transition to a different approach which we expect will translate to improved performance in the coming months.** At the same time, we are working together with Yucaipa to develop longer-term strategies to drive sustainable success in the future. **These efforts combined with our strong strategic position in the Northeast, our superior store base and our resolve to implement strategic changes makes me confident in the Company's long-term prospects.**" [Emphasis added.]

30.     Also on January 12, 2010, A&P filed a Form 10-Q with the SEC. In addition to making statements that were substantially similar to those contained in the January 12, 2010 release.

31.     On, May 5, 2010, A&P issued a press release announcing its financial results for the fiscal fourth quarter of 2009, ended February 27, 2010. Defendant Marshall commented on the results stating, in pertinent part, as follows:

The past year was certainly a challenge, as the economy continued its sluggish pace. **The good news is that we have identified several critical issues within our organization that will lead us back to market prominence.** We are committing our undivided attention to clarifying our brand identity in our principal banners, completing the integration of the Pathmark acquisition and maximizing supply chain cost improvement opportunities.

*     *     *

- 13 -

> **The fixes in our Company are attainable and the initiatives are in place today to provide us the path forward**.  Concurrent to transforming the culture of our Company, **we are gaining ground in better understanding our customer, developing the skills critical for our success, making prudent reinvestments in our business and reducing costs through a process of continuous improvement**.  Our sole mission is to make The Great Atlantic & Pacific Tea Company great, again." [Emphasis added.]

The press release also stated that A&P planned on filing a shelf registration statement with the SEC following the filing of the Company's Annual Report on Form 10-K.  In connection with its convertible preferred stock offering in August 2009, the Company agreed to register all of the shares of common stock beneficially owned by Tengelmann and Yucaipa, including the shares issuable upon conversion of the convertible preferred stock.  The Company also replenished its shelf capacity by registering up to $500.0 million of securities for primary sales.

32.    On May 6, 2010, A&P filed its Form 10-K with the SEC, which confirmed the previously announced financial results and was signed by defendants Marshall and Galgano among others.

33.    The statements referenced above in ¶¶28-33 were each materially false and misleading for the reasons stated herein at ¶26.

34.    On July 23, 2010, A&P issued a press release announcing that the Company had appointed defendant Martin as President and Chief Executive Officer, following the unscheduled departure of defendant Marshall.  At that time, A&P also announced its fiscal 2010 first quarter results and that the Company had launched a

"turnaround," designed to strengthen A&P's operating and financial foundation.

Regarding fiscal first quarter results, the press release stated, in pertinent part, as

follows:

> First Quarter 2010 Financial Highlights
>
> Sales for the first quarter were $2.6 billion versus $2.8 billion in last fiscal year's first quarter.  Comparable store sales decreased 7.2%.
>
> Excluding non-operating items, adjusted EBITDA was $19 million versus $81 million for last fiscal year's first quarter.
>
> Adjusted loss from operations was $51 million versus adjusted income from operations of $4 million in last fiscal year's first quarter.
>
> For the first quarter, reported loss from continuing operations was $116 million which includes charges of $5 million for long-lived asset impairment and income of $8 million for mark to market adjustments related to financial liabilities.
>
> Loss from continuing operations in last year's first quarter totaled $58 million and included losses of $2 million for mark to market adjustments related to financial liabilities.

In addition to the foregoing, the July 23, 2010 release also quoted defendants Haub

and Martin, in part, as follows:

> [Defendant Haub], said, "**The Board and the company's major shareholders, Tengelmann and Yucaipa, have been instrumental in developing what I believe is the right turnaround strategy for A&P**. As we moved to the implementation and execution stage of this comprehensive operational and revenue-driven turnaround, the Board determined that the company needed a leader at the helm with the skill set Sam Martin possesses.  Sam is a proven, hands on operational expert in the food retail industry.  He has an ideal mix of food industry management experience encompassing operations, merchandising and supply chain.  **We are confident that he will successfully drive the rapid implementation of our multi-faceted effort to make A&P a**

- 15 -

**stronger and more efficient company**.  We thank Ron Marshall for his service and wish him well in his future endeavors."

\*       \*       \*

"**Although we are clearly disappointed with our performance in the first quarter, we are confident that we now have the right leadership in place to drive this operational and revenue-driven turnaround effort and make A&P a great company again.**  We are focused on improving our customer value proposition, as well as significantly reducing our structural and operating costs.  Our progress on enhancing our customers' experience across our store formats illustrates our commitment to moving forward aggressively.  **We remain steadfastly focused on taking the actions necessary to position A&P for a strong future.**"  [Emphasis added.]

Regarding the Company's purported "Turnaround Strategy," and the positive effects of the implementation thereof, the press release also stated, in pertinent part, as follows:

Turnaround Strategy

The comprehensive operational and revenue-driven turnaround initiative is designed to generate sustained profitability and cash flow, drive sales growth, restore competitive margins to the business and strengthen the foundation of the company for the long term.  The four key elements of the turnaround are:

- Improve the company's customer value proposition through merchandising;

- Enhance the customer experience and drive clear brand identity;

- Lower structural and operating costs; and

- Implement new financing initiatives to augment first quarter liquidity of $253 million.

In addition to its revenue-generation and cost reduction initiatives, the company is pursuing capital raising opportunities, including incremental

- 16 -

financing through its current bank facility.  The company also is pursuing sale-leaseback transactions and the sale of certain non-core assets.

[Defendant Martin] said, "**I firmly believe that this turnaround will strengthen A&P's operating foundation and improve our performance.  I have faced similar situations in my career and have successfully navigated through them**.  We will move quickly to implement this turnaround for the benefit of all our stakeholders."

[Defendant Haub] said, "**I am confident that by executing on this far-reaching turnaround under Sam's leadership, we will strengthen the foundation of the company for the long term.**  Tengelmann and Yucaipa remain actively involved in our efforts to improve the company's performance, and **I am encouraged by their continued belief in the long-term value of their investment in A&P.**

"I thank our employees and our supplier partners for their hard work and dedication to our company and to our customers.  **I am confident that these two key constituencies will continue to make vital contributions to the success of our company for many years to come.**" [Emphasis added.]

35.    On August 13, 2010, A&P announced the closing of certain stores as part of the Company's operational and revenue-driven turnaround initiative, the purported "Turnaround Strategy," designed to generate sustained profitability and cash flow, drive sales growth, restore competitive margins to the business and strengthen the foundation of the Company for the long term.  A&P defendants published a release that again quoted defendant Martin, in part, as follows:

"As part of our turnaround, we have initiated a detailed review of our store footprint and have decided to close these 25 locations.  While this was a very difficult decision that will unfortunately impact some of our customers, partners, communities and employees, these **actions are absolutely necessary to strengthen A&P's operating foundation and improve our performance going forward**...."

- 17 -

"**We are moving forward aggressively to advance our turnaround and position A&P for a strong future**.  Even as we reduce our store base and drive efficiencies across our Company, A&P continues to remodel stores and take other important steps to enhance our customers' experience across our store formats.  To this end, we are set to re-open two newly remodeled stores in the coming month." [Emphasis added.]

36.    On October 21, 2010, A&P issued a press release announcing its financial results for the fiscal second quarter of 2010, and providing a purported "Update" on the Company's Turnaround Plan.  Regarding the results for the fiscal second quarter, this release stated, in part, the following:

Second Quarter 2010 Financial Results

Sales for the second quarter were $1.9 billion versus $2.1 billion in last fiscal year's second quarter.  Comparable store sales decreased 6.6 percent.

For the second quarter, reported loss from continuing operations was $143 million versus last year's second quarter reported loss from continuing operations of $62 million.

EBITDA was negative $45 million for the second quarter versus $42 million for the last fiscal year's second quarter.

Excluding certain non-cash and non-operating items (detailed on Schedule 3), adjusted EBITDA was $8 million versus $65 million for last fiscal year's second quarter.

Availability under the Company's credit facility was $181 million at the end of the second quarter.

[Defendant Martin] said, "Our second quarter financial results are disappointing.  But, **we have developed a comprehensive turnaround plan and have quickly begun to implement it**.  The first step in that plan is the formation of a new management team.  **With our talented and deeply experienced new team now in place, we have begun to execute against the other steps in the plan on an accelerated basis."** [Emphasis added.]

37.     The statements referenced above in ¶¶35-37 for the reasons stated herein in ¶26.

38.     On December 10, 2010, A&P shocked and alarmed investors after they revealed, for the first time, that the Company was performing so far below expectations and that the purported Turnaround Program was failing so miserably that the Company would likely be forced to file for bankruptcy protection.  That day, Bloomberg reported, in part, the following:

### A&P Said to Consider Filing for Bankruptcy Protection

Great Atlantic & Pacific Tea Co., the once-dominant grocery-store chain founded in 1859, may file for bankruptcy in the coming days to restructure debt, two people with knowledge of the matter said.

\*        \*        \*

A filing to reorganize under court protection may come as soon as this weekend, said the people, who declined to be identified because the matter is private.  A&P hired law firm Kirkland & Ellis LLP to represent it in negotiations with creditors and in any Chapter 11 proceeding, the people said.

\*        \*        \*

Hamstrung

A&P has lagged behind rivals on fresh food and presentation, said Jim Hertel, a managing partner at Willard Bishop Consulting, a Barrington, Illinois-based firm which advises retailers and suppliers.  **A&P also has been hamstrung by a heavily unionized workforce, he said**.

**A&P's labor costs mean the company has less flexibility to invest in other parts of the store**, Hertel said today in a telephone interview.

\*        \*        \*

- 19 -

'Illiquid'

**A&P "may be illiquid at some point in the near term**," Standard & Poor's said in July, issuing a downgrade of the company's corporate credit rating to CCC.  [Emphasis added.]

39.     The same day, Reuters reported, in part, the following:

People familiar with the company's vendors said some vendors - including the companies that actually deliver the food to their stores - are now requiring cash on delivery, increasing the grocer's rate of cash burn. An attorney for one of the company's major vendors declined to comment.  A large vendor, C&S Wholesale Grocers, also declined to comment.

*       *       *

Around mid-September, A&P's net debt was $1.48 billion -- roughly eight times its market value.  The company's property was worth $1.37 billion at book, but it is burning through $55 million to $65 million of cash every quarter.

"When your creditors begin to get nervous about your credit situation, they request cash on delivery and refuse to extend you any credit," said Scott Peltz, a restructuring expert at McGladrey's Financial Advisory Services Group in Chicago.  "The liquidity crisis then becomes enhanced by the need to essentially fund their inventory with cash, seriously exacerbating the situation."

The company has sought help from advisors with more than $1 billion in debt maturing over the next two years, sources with direct knowledge of the situation said.

First up for the company is $165 million in convertible debt that comes due in June of 2011.  Then the company has another convertible note of $255 million due as well as about $700 million in a variety of bank notes that mature.

Much of the debt dates to the company's 2007 purchase of Pathmark Stores.  Bank of America and the now bankrupt Lehman Brothers provided a nearly $1.4 billion financing package at that time.  **Yucaipa**

**had been a shareholder in Pathmark and received a stake in A&P at that time.  It also has two board seats.**  [Emphasis added.]

40.    Remarkably, as part of the Reuters report, it was ultimately revealed that Yucaipa and Tengelmann had increased their debt position, in the months leading up to the bankruptcy of the Company, as a means of taking control over A&P.  In this regard, the Reuters report stated, in part, the following:

YUCAIPA, TENGELMANN STOCKHOLDERS

**Its biggest stockholders are activist investor Ron Burkle and the German retail group Tengelmann.  Burkle's Yucaipa investment firm has built up a large position in the company's debt recently, putting it in a stronger position to take control of the company if it enters bankruptcy as part of the restructuring, people familiar with the firm's activities said**.  [Emphasis added.]

41.    Following the announcement that the Company's restructuring plan had utterly failed and that the Company would imminently file for bankruptcy.  The revelations that the Company had materially misrepresented its financial and operational condition, its controls and procedures and its results of operations, belatedly revealed on December 10, 2010 caused shares of A&P stock to collapse almost 70% in the single trading day - - falling from a close of $2.82 per share, to approximately $0.93 per share on December 10, 2010, on very high trading volume of over 19.98 million shares traded.

## CAUSATION AND ECONOMIC LOSS

42.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the

price of A&P securities and operated as a fraud or deceit on Class Period purchasers of A&P securities stock by misrepresenting the Company's financial results.  Over a period of approximately sixteen months, defendants issued a series of materially false and misleading statements, as detailed herein.  Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of A&P declined precipitously - - evidence that the prior artificial inflation in the price of A&P securities was eradicated.  As a result of their purchases of A&P securities during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

43.     By improperly characterizing the Company's financial results and misrepresenting the Company's prospects, defendants presented a misleading image of A&P's business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control expenses, and consistently reported expenses and expense ratios within expectations and within the range for which the Company was adequately reserved.  These claims caused and maintained the artificial inflation in the price of A&P securities throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

44.     Defendants' materially false and misleading statements had the intended effect of causing the price of A&P securities to trade at artificially inflated levels throughout the Class Period  - - reaching a Class Period high of almost $13.00 per

share in early January 2010.  The price of A&P preferred securities also traded at inflated levels and declined when the truth was revealed.

45.     On December 10, 2010, however, as investors learned the truth about the Company, and learned that A&P's purported turnaround plan had failed and that the Company would be forced to file for bankruptcy protection, the price of A&P securities collapsed.

46.     These belated revelations also evidenced defendants' prior falsification of A&P's business prospects due to defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from A&P's share price and investors were damaged as a result of the related share price decline.

47.     As a direct result of investors learning the truth about the Company on December 10, 2010, A&P's stock price collapsed almost 70% - -  in the single trading day, on very high trading volume of over 19.98 million shares traded.  This dramatic share price decline, eradicated much of the artificial inflation from A&P's share price, causing real economic loss to investors who purchased these securities during the Class Period.

48.     The decline in the price of A&P securities at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to

investors and to the market.  The timing and magnitude of the price declines negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

49.     The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of A&P securities and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.  The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



NYSE: GAP / Common Stock



NYSE: GAJ / Preferred Stock

## ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding A&P, their control over, and/or receipt and/or modification of A&P's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning A&P, participated in the fraudulent scheme alleged herein.

- 25 -

51.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because the misrepresentations: (i) deceived the investing public regarding A&P's business, operations, management and the intrinsic value of A&P securities; (ii) enabled defendants to artificially inflate the price of A&P securities; (iii) enabled A&P to sell over $430 million of Company debt on favorable terms; and (iv) caused plaintiff and other members of the Class to purchase A&P securities at artificially inflated prices.

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

52.     At all relevant times, the market for A&P's securities was an efficient market for the following reasons, among others:

(a)     A&P's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)     As a regulated issuer, A&P filed periodic public reports with the SEC and the NYSE;

(c)     A&P regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    A&P was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

53.    As a result of the foregoing, the market for A&P securities promptly digested current information regarding A&P from all publicly available sources and reflected such information in A&P stock prices.  Under these circumstances, all purchasers of A&P securities during the Class Period suffered similar injury through their purchase of A&P securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of A&P who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

55.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by A&P, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

59.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for A&P securities. Plaintiff and the Class would not have purchased A&P securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

60.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of A&P securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against Individual Defendants

61.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.    The Individual Defendants acted as controlling persons of A&P within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false

financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.    As set forth above, A&P and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  September 9, 2011          COHN LIFLAND PEARLMAN
                                             HERRMANN & KNOPF LLP
                                    PETER S. PEARLMAN


                                     *s/ Peter S. Pearlman*
                                   PETER S. PEARLMAN

Park 80 West-Plaza One
250 Pehle Ave., Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)


KAHN SWICK & FOTI LLC
MICHAEL SWICK
500 Fifth Avenue, Suite. 1810
New York, NY  10110
212/ 696-3730

*Attorneys for Plaintiff*