COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West-Plaza One
250 Pehle Ave., Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

<div align="center">

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| RICKY DUDLEY, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CHRISTIAN W. E. HAUB, ERIC CLAUS, BRENDA M. GALGANO, RONALD MARSHALL, SAMUEL MARTIN, THE YUCAIPA COMPANIES LLC, RONALD BURKLE AND FREDERIC BRACE, )<br><br>Defendants. ) | No. 2:11-cv-05196-WJM-MF<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

Lead Plaintiffs City of New Haven Employees' Retirement System and Plumbers and Pipefitters Locals 502 & 633 Pension Trust Fund ("Lead Plaintiffs" or "Plaintiffs") have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by The Great Atlantic & Pacific Tea Company, Inc. ("A&P" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of the Company, and public filings in A&P's Chapter 11 proceedings in the U.S. Bankruptcy Court for the Southern District of New York. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the securities of A&P between July 23, 2009, and December 10, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      A&P is engaged in the food retail business and operates conventional supermarkets, combination food and drug stores, and discount food stores. In 2007, A&P acquired Pathmark Stores, Inc. ("Pathmark"), a discount supermarket chain in which The Yucaipa Companies LLC ("Yucaipa") had been the majority shareholder.

3.      By the start of the Class Period, on July 23, 2009, A&P was still struggling to integrate the Pathmark acquisition, and was facing reduced profitability across its business. A&P fuelled shareholder optimism by announcing that Yucaipa had agreed to invest $115 million in the Company, in exchange for a 27.6% ownership interest in A&P and the right to appoint two board members. Yucaipa's investment was conditioned upon a private placement of second lien senior secured notes due 2015 (the "2015 Notes Offering"). On August 4, 2009, A&P announced that the notes had priced at 11.375% (the "11.375% Notes"), and that the 2015 Notes Offering had raised

$260 million in proceeds, which – together with the capital infusion by Yucaipa – had "significantly strengthened" the Company's financial condition.

4.      Unbeknownst to investors, however, A&P was able to conduct the 2015 Notes Offering on more favorable terms because Defendants improperly delayed recognizing a $321.8 million impairment charge to the value of the Pathmark business' goodwill, which Defendants knew or recklessly disregarded was impaired by the summer of 2009.  As a consequence, A&P's income and assets were materially overstated during the first and second fiscal quarters of 2009, and its financial results were not presented in conformity with Generally Accepted Accounting Principles ("GAAP").  When A&P belatedly disclosed the goodwill impairment charge on January 12, 2010, the price of A&P stock fell nearly 21%.

5.      Yet, investors were still unaware of the crux of Defendants' fraudulent scheme. Although Defendants repeatedly represented to investors that A&P's "partnership" with Yucaipa was helping to turn the Company's fortunes around and create shareholder value, in truth, and in fact, Yucaipa was vying for control of A&P.  Yucaipa's investment in A&P at the start of the Class Period was the first step by Ronald Burkle ("Burkle"), its Chairman, in his plan to take over the Company – which he knew could not be turned around – so that he could steer A&P's eventual Chapter 11 reorganization into a private company run by him.  Indeed, since Yucaipa was Pathmark's former majority shareholder, Burkle knew that the Pathmark business was in far worse condition than had been disclosed to investors.

6.      Defendants also falsely stated that A&P was making progress in implementing a turnaround plan, when in fact, the Company's operational and financial condition were rapidly deteriorating, and its turnaround efforts were constrained by the Company's high rate of cash burn and worsening liquidity crisis.  For example, by the summer of 2010, A&P's vendors were requiring cash upon delivery, thereby increasing the Company's rate of cash burn and contributing to A&P's

liquidity crisis. By June 2010, A&P was failing to pay its lease obligations on "dark stores" and had been sued by a multitude of landlords as a result.

7. Investors were likewise unaware that Burkle had insisted on the 2015 Notes Offering as a condition to Yucaipa's initial investment in A&P because he expected the 11.375% Notes to receive high priority during a Chapter 11 reorganization, and planned to purchase the notes in order to position himself to take control of A&P once it filed for Chapter 11. By no later than October 2010, Yucaipa had begun to accrue a large stake in A&P's debt by buying up the 11.375% Notes.

8. At the same time, Defendants were continuing to represent that A&P's turnaround efforts were progressing, that the Company's rate of cash burn was slowing, and that A&P would be able to procure additional financing to fund the turnaround. In reality, A&P's very poor credit rating, combined with tight global credit markets, meant that there was no realistic possibility of securing the financing necessary to maintain A&P's liquidity, and indeed, Defendants knew that A&P's Chapter 11 filing was both imminent and unavoidable.

9. On December 10, 2010, investors learned that A&P's turnaround plan had failed, and its financial condition and liquidity had deteriorated so severely, that the Company was expected to file for bankruptcy protection under Chapter 11 within days. Media reports also revealed that A&P's purported "partner" Yucaipa had purchased large quantities of A&P's debt, so as to position itself to take control of A&P during its Chapter 11 reorganization.

10. After investors reacted to this news, A&P common stock closed at $0.93 per share on December 10, 2010 – a dramatic decline from the Class Period high of $12.89 per share, reached on January 8, 2010. Two days later, A&P filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

11. As planned, Yucaipa's influence and substantial holdings in A&P enabled Burkle to take control of a restructured A&P, which is now poised to be more profitable after shedding the burdensome liabilities that contributed to its bankruptcy filing. Shareholders of A&P's common stock, by contrast, have had their investments in A&P wiped out.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act [15 U.S.C. §78aa].

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). A&P maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

15. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

16. Lead Plaintiffs purchased the securities of A&P during the Class Period, as set forth in their certifications previously filed with this Court and incorporated herein by reference, and have been damaged thereby.

17. A&P was founded in 1859 and currently operates conventional supermarkets, combination food and drug stores, and discount food stores. The Company maintains its chief executive offices and principal place of business at 2 Paragon Drive, Montvale, New Jersey 07645. Prior to and during the Class Period, A&P's common stock was publicly traded on the New York

Stock Exchange ("NYSE") under the ticker symbol "GAP."  As detailed herein, A&P filed for protection under Chapter 11 of the United States Bankruptcy Code and for that reason is not named as a defendant in this action.  On March 13, 2012, A&P emerged from bankruptcy as a private company.

18.    Defendant Christian W. E. Haub ("Haub") served as Executive Chairman and Chairman of the Executive Committee of the Board of Directors of A&P during the Class Period.  In addition, Defendant Haub served as interim Chief Executive Officer ("CEO") of A&P following the departure of Defendant Eric Claus ("Claus") on October 19, 2009, until Defendant Ronald Marshall ("Marshall") was appointed as CEO on or about February 8, 2010.  Defendant Haub is also Co-CEO of Tengelmann Warenhandelsgesellschaft KG ("Tengelmann"), a limited partnership organized under the laws of Germany.  Tengelmann has been A&P's largest and majority shareholder since 1979, when A&P's founding family sold a majority of their shares to Tengelmann.  During the Class Period, Tengelmann owned and/or controlled at least 38.6% of the Company's shares.

19.    Defendant Claus served as CEO and President of A&P during the Class Period, until his departure from the Company on October 19, 2009.

20.    Defendant Brenda M. Galgano ("Galgano") served as Chief Financial Officer ("CFO"), Senior Vice President and Treasurer of the Company during the Class Period.

21.    Defendant Yucaipa, together with its affiliated entities,[1] is a Los Angeles-based private equity firm with a track record of investments in the U.S. supermarket industry, headed by activist investor and financier Burkle.  According to Yucaipa, it "foster[s] economic value through the growth and responsible development of companies," and "works with management to

---

[1]    Yucaipa's affiliates include Yucaipa Corporate Initiatives Fund I, LP, Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP and Yucaipa Advisors, LLC.

strategically reposition businesses and implement operational improvements, resulting in value creation for investors." During the Class Period, Yucaipa held at least 4.4% of A&P's common stock and all of A&P's Series A-Y preferred stock, giving Yucaipa a 27.6% equity interest in the Company. In addition, Yucaipa was entitled to appoint two members of A&P's board of directors. Yucaipa also purchased substantial amounts of A&P's debt securities, including the 11.375% Notes issued at the start of the Class Period as a condition to Yucaipa's $115 million equity investment in A&P.

22.    Defendant Burkle is the founder and Chairman of Yucaipa.

23.    Defendant Marshall served as CEO and President of A&P during the Class Period, having assumed this position on or about February 8, 2010. Defendant Marshall previously served as Executive Vice President and CFO of Pathmark – in which Burkle held a majority stake – prior to A&P's acquisition of Pathmark in 2007.

24.    Defendant Samuel Martin ("Martin") served as CEO and President of A&P during the Class Period, having assumed this position on or about July 23, 2010, following the unscheduled departure of Defendant Marshall. Defendant Martin previously served as Chief Operating Officer of Wild Oats Markets, Inc. during the time that Burkle was an investor in that company, and held a senior management position at Fred Myer, another supermarket chain in which Burkle has invested. Upon information and belief, Defendant Martin was appointed as CEO and President at the direction of Defendant Burkle.

25.    Defendant Frederic (a.k.a. Jake) Brace ("Brace") was appointed to A&P's board of directors on or about August 4, 2009 by Yucaipa. On August 20, 2010, Defendant Brace was appointed to the newly-created executive position of Chief Administrative Officer, reporting directly to Defendant Martin. Defendant Brace previously served as CFO and Chief Restructuring Officer of United Airlines during its Chapter 11 reorganization, and has also served on the boards of Neff

Holdings and Serva during their Chapter 11 reorganizations. On December 12, 2010, when A&P filed for Chapter 11 bankruptcy protection, the Company announced that Defendant Brace would serve as its Chief Restructuring Officer.

26.     During the Class Period, Defendants were privy to confidential and proprietary information concerning A&P, its operations, finances, financial condition and present and future business prospects. Because of their positions with A&P, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of A&P's business.

28.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

29.    As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to A&P's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of A&P's securities would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of A&P securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding A&P's business, operations, management and the intrinsic value of A&P securities; (ii) enabled A&P to raise $435 million, including $260 million in debt financing, at a time when the Company was in desperate need of capital; and (iii) caused Plaintiffs and other members of the Class to purchase A&P securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

31.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of A&P between July 23, 2009, and December 10, 2010, inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, A&P securities were actively traded on the NYSE and other exchanges.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by A&P or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of A&P;

(c)     whether the price of A&P securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

37.     Founded in 1859, A&P was one of the nation's first supermarket chains, and was once the largest in the U.S.  As of July 23, 2009, the Company operated 435 stores in the Northeast and Mid-Atlantic under the following trade names: A&P, Waldbaum's, Pathmark, Pathmark Sav-a-Center, Best Cellars, The Food Emporium, Super Foodmart, Super Fresh and Food Basics.

38.     A&P's stores offer grocery products that include frozen foods; dairy; meat, deli and seafood; bakery; fresh produce; floral; general merchandise; health and beauty aids; wine, beer and spirits; and pharmacy products, as well as on-site banking services.  The Company's fiscal year ends on the last Saturday in February.

39.     Since it's peak in the 1930s, the Company's operations have shrunk considerably, and in recent years, its profits have slumped.  In 2007, A&P acquired discount supermarket chain Pathmark for approximately $1.4 billion in a transaction that grew the Company's store base by 141 stores and added $475 million in debt to its balance sheet.  In connection with the Pathmark acquisition, Pathmark's major shareholder, Defendant Yucaipa, received 4.4% of A&P's common stock.  Thereafter, A&P struggled to integrate the Pathmark acquisition, while at the same time facing decreased sales and declining profitability throughout its business.

### Yucaipa Invests in A&P as a Means of
### Gaining Control of the Company

40.    At the start of the Class Period, on July 23, 2009, A&P announced that Yucaipa was investing $115 million in the Company, in the form of newly-created preferred shares, together with an additional $60 million investment by Tengelmann, A&P's existing majority shareholder.  In return, Yucaipa would receive a 27.6% ownership interest in A&P and would be entitled to appoint two members to A&P's board of directors.  A&P also stated that the new investment by Yucaipa and the additional investment by Tengelmann were conditioned upon the completion of the 2015 Notes Offering.  On August 4, 2009, A&P announced the completion of the 2015 Notes Offering – which had priced at 11.375% and raised $260 million in proceeds – and the contingent capital infusion by Yucaipa and Tengelmann.

41.    Throughout the Class Period, Defendants highlighted A&P's new "partnership" with Yucaipa and represented that Yucaipa was helping to turn the Company's fortunes around and create shareholder value.  In truth, the "partnership" with Yucaipa was anything but a partnership, as Yucaipa was vying for control of A&P.

42.    Indeed, Yucaipa's investment in A&P, which gave it a substantial voting interest and two board seats, was the first step in Burkle's plan to take over the Company – which he knew could not be turned around – so that he could steer A&P's eventual Chapter 11 reorganization into a private company run by him.

43.     According to Confidential Witness 1 ("CW1"),[2] Burkle quickly installed his own management team at A&P, including Tom Dehlen, an operating partner at Yucaipa, who CW1 stated was Burkle's "right hand man" and essentially acted as a second CEO.  CW1 further stated that Burkle appointed Defendant Brace to the board of directors on August 4, 2009 because of his bankruptcy expertise, with the intention that Brace would manage A&P's eventual Chapter 11 reorganization, and steer the process in Burkle's favor.

44.     Although Yucaipa was entitled to appoint two board members, CW1 reported that additional Yucaipa personnel attended A&P board meetings during the Class Period, such that approximately 40% of the attendees at the meeting  represented Yucaipa's interests.

45.     By October 20, 2009, Yucaipa had control of A&P and was able to oust Defendant Claus (whom CW1 stated "butted heads" with Burkle) from his position as CEO.  CW1 further stated that Burkle eventually brought Defendant Martin in as CEO following Defendant Marshall's departure.

<div align="center">

**The Pathmark Business Was in Far Worse
Condition than Investors Were Aware**

</div>

46.     Burkle, as the former majority shareholder of Pathmark prior to its acquisition by A&P, was also uniquely positioned to know that the Pathmark business was in far worse condition than had been publicly disclosed to investors.

47.     According to CW1, "there turned out to be a lot of skeletons in the closet" concerning Pathmark's financial condition that emerged after the acquisition was complete.  CW1 stated that

---

[2]     CW1 is a former senior management-level employee who worked at A&P since before the Pathmark acquisition in 2007, through the spring of 2010.  CW1 worked at A&P's corporate headquarters in Montvale, New Jersey, reporting directly to the Company's CEO, and regularly attended board meetings and other meetings with A&P's executive management.  As a result, CW1 was in a position to have, and did have, first-hand knowledge of the information that he/she provided.

Burkle and Yucaipa tried to keep Pathmark's business "bolstered" until it was acquired by A&P. For example, CW1 stated that many Pathmark stores were plagued by massive amounts of "stock loss" (*i.e.*, theft), including organized crime within the stores. CW1 reported that following the Pathmark acquisition, A&P's total stock loss "ballooned" to between $150 million and $160 million per year, most of which was attributable to Pathmark. CW1 further stated that the massive amount of stock loss at Pathmark stores was discussed during a managers' conference in the spring of 2009, at which Defendant Claus and other senior executives were present.

48.     In addition, CW1 reported that after the acquisition, A&P discovered hundreds of millions of dollars worth of pension and vacation liabilities held by Pathmark, which had been "buried," such that A&P and its acquisition advisor had not discovered the liabilities during the due diligence process.

### Defendants Improperly Delayed Recognizing a Goodwill Impairment Charge for the Pathmark Business

49.     During the Class Period, Defendants represented that A&P's financial statements were prepared in conformity with GAAP. These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of more than $320 million for A&P's Pathmark business, thereby falsely inflating the Company's income and assets during the Class Period, until A&P belatedly recognized the charge on January 12, 2010.

50.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.[3] As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it

---

[3]     The Complaint references GAAP provisions in existence during the relevant time period.

provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

51.    Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).

52.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  During the Class Period, companies accounted for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized and reported as goodwill, which is an asset representing the future economic benefits acquired in a business combination that are not individually identified and separately recognized.  In essence, goodwill reflects the going concern value of the business acquired and its expected contribution to combined enterprise's future earnings growth.  *See, e.g.*, SFAS No. 141 ¶¶101-14.

53.    During the Class Period, companies were required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*.  SFAS No. 142 requires that a company review its goodwill to determine if its reported value is impaired.  The value of goodwill is impaired when the carrying, or reported, amount of goodwill exceeds its fair value.  GAAP

requires that goodwill be tested for impairment at least **annually, and more often when events or circumstances arise indicating the goodwill could be impaired**.[4] *See, e.g.*, SFAS No. 142 ¶¶18-29.

54.    Testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing is required.  However, if the carrying value of the unit exceeds its fair value, then a second step is performed to measure the amount of the impairment.  Companies are required to perform goodwill testing at the so-called reporting unit level.  *See, e.g.*, SFAS No. 142 ¶¶17-22.

55.    A&P's Form 10-K for the year ended February 28 2009, which was signed by Defendants Haub, Claus and Galgano, included its Annual Report for the same fiscal period (the "fiscal 2008 Annual Report").  Defendants' understanding of GAAP's mandate associated with goodwill is affirmed by the disclosure in the fiscal 2008 Annual Report, which stated, in pertinent part as follows:

> Goodwill and other intangibles with indefinite useful lives that are not subject to amortization are tested for impairment in the fourth quarter of each fiscal year, **or more frequently whenever events or changes in circumstances indicate that impairment may have occurred.  Possible indicators of impairment include, but are not limited to sustained operating losses or poor operating performance trends, a significant decline in our expected future cash flows for a reporting unit, a decrease in our market capitalization below our book value for a sustained period of time**, and an expectation that a reporting unit will be disposed of or sold.  When indicated, we perform an evaluation to determine if impairment has occurred.  If impairment is identified, we measure and record the amount of the impairment loss.
>
> **For goodwill, the first step of the impairment analysis is performed by comparing the estimated fair value of each reporting unit to the related carrying value of the**

---

[4]    All emphasis is added unless otherwise noted.

***net assets of that reporting unit.*** If the fair value of the reporting unit exceeds the carrying value of the net asset of that reporting unit, goodwill is not deemed to be impaired and no further testing is performed.

***If the carrying value of the net assets for a reporting unit exceeds the related fair value, the second step of the impairment test is performed to measure any potential impairment. The second step of the goodwill impairment test compares the fair value of the reporting unit's goodwill with the carrying value of goodwill.*** To determine the fair value of goodwill, the fair value of the reporting unit is allocated to all of its assets and liabilities, with the excess allocated to goodwill. ***If the carrying amount of a reporting unit's goodwill exceeds the fair value of that goodwill, an impairment loss is recognized for the difference.*** During fiscal 2008, we concluded that our goodwill balance was not impaired.

56.     During the first and second fiscal quarters of 2009, A&P materially overstated its income and assets by more than $320 million when it failed to timely record an impairment in the value of the goodwill it attributed to its "Price Impact" reporting segment. A&P's Price Impact segment includes the operations of the Pathmark business it acquired during the fourth fiscal quarter of 2007 and the operations of the Pathmark Sav-A-Center stores it converted to that segment during the third fiscal quarter of 2008.

57.     Indeed, the indicators of possible goodwill impairment that A&P identified in the fiscal 2008 Annual Report were in existence no later than the first fiscal quarter of 2009, ended June 20, 2009. By no later than summer of 2009, A&P's Pathmark business was in steep decline, a condition that A&P identified in the fiscal 2008 Annual Report as being an indicator of possible impairment. Nonetheless, Defendants knowingly or recklessly caused A&P to improperly delay the recognition of more than $320 million in impaired goodwill associated with the Pathmark business, which it reported in its Price Impact segment.

58.     On January 12, 2010, when A&P reported its financial results for the third fiscal quarter of 2009, ended December 5, 2009, it belatedly announced a $321.8 million charge associated with the impairment of the entire amount of goodwill reported in its Price Impact segment. In response to this news, the price of A&P common stock plummeted nearly 21%, from a closing price

of $12.88 per share on January 11, 2010, to close at $10.22 per share on January 12, 2010, on unusually heavy trading volume of more than 3 million shares traded. The price of A&P common stock declined an additional 15% over the next five trading days, as the market digested the import of A&P's massive goodwill impairment charge associated with its Pathmark business, closing at $8.66 per share on January 20, 2010.

59.    With respect to the Company's Pathmark business, Defendant Haub, on A&P's earnings conference call for the second fiscal quarter of 2009, held on October 20, 2009, admitted that Pathmark was operating in "one of the wors[t] environments I have ever experienced in my career in the supermarket industry," stating, in pertinent part, as follows:

> Our price impact on Pathmark business is not performing at the level it should but we are working very hard to implement the necessary changes to return this business to a better level of performance. To that end *we have made significant price investments in that business which has hurt results in the quarter*. It . . . takes time to get credit from the consumer for these price reductions but we are seeing some promising early signs such as increased traffic and item counts although they are not enough yet to pay for the overall investment.

> We also increased our marketing spend in the quarter to make our customers more aware of our proof pricing and again we believe it will take some time before this message has fully registered with consumers. *When it comes to describing the overall environment we are operating in, I can certainly say that the external headwinds has really become worse during the second quarter and the first part of our third quarter. Unemployment keeps rising. Consumers continue to trade down. Price competition is heating up in our markets and now we are also experiencing significant deflation across our entire business. It is fair to say that we are currently going through one of the wors[t] environments I have ever experienced in my career in the supermarket industry.*

60.    The draconian price cuts implemented at Pathmark in the summer of 2009, which Defendant Haub euphemistically referred to as "price investments" on the conference call, were made in response to intense price competition. These massive price cuts, coupled with a major advertising campaign, were made by Defendants in a desperate attempt to drive traffic to its Pathmark stores – and caused A&P's Price Impact segment to lose an unprecedented amount of

money during the second fiscal quarter of 2009, ended September 12, 2009, as illustrated in the chart below:



61.    Despite numerous indicators of goodwill impairment, including intense price competition, significant deflation, a forbidding supermarket industry environment and unprecedented operating losses, Defendants knowingly or recklessly failed to impair the value of the Price Impact segment's goodwill.  To the contrary, in its Form 10-Q/A for the second fiscal quarter of 2009, ended September 12, 2009 (the "Second Quarter Form 10-Q/A"),[5] A&P represented that, notwithstanding the: (i) severity and duration of operating losses; (ii) reduced internal revenue and profitability forecasts; and (iii) revised cash flow projections associated with its Price Impact segment, Defendants had determined that the Price Impact segment could withstand an incremental

---

[5]    The Form 10-Q originally filed with the SEC on October 20, 2009 was amended the same day to replace Defendant Claus' signature with Defendant Haub's signature, after Defendant Claus left the Company on October 19, 2009.

*25%* decrease in its fair value before the segment's goodwill would suffer an impairment in value.

The Second Quarter Form 10-Q/A stated, in part:

> As disclosed in Form 10-Q for our first quarter ended June 20, 2009, we continue to monitor actual results and projections for the necessity of a possible impairment charge. Due to the severity and duration of operating losses within the Price Impact reporting unit, we have reduced our shorter term internal revenue and profitability forecasts and revised our operating plans and cash flow projections. Even though our business outlook has worsened due to the current economic recession, *we determined that a hypothetical decrease in fair value of over 25% would be required before the Price Impact reporting unit would have a carrying value in excess of the fair value. Despite unfavorable operating results within the Price Impact reporting unit, we do not believe the long-term value of the reporting unit has been reduced to below its carrying value and therefore, there has not been a triggering event requiring us to perform an interim goodwill impairment analysis at this time.*

62.    Defendants could not have, and did not, believe these statements to be true. In fact, during the summer of 2009, *the market valued the entire A&P enterprise* at between $215 million and $490 million, while its cash balance averaged approximately $234 million.

63.    After subtracting the average amount of A&P's cash from the market's valuation of the overall A&P enterprise, the entirety of A&P's net assets were valued between zero and $256 million. Accordingly, Defendants must have known, or recklessly ignored, that their representations set forth in A&P's financial statements and in other disclosures about the Company's goodwill during the Class Period were materially false and misleading – particularly since the Price Impact Segment represented *less than half* of A&P's total business, but its reported goodwill totaled more than *$321 million.*

64.    Indeed, in A&P's fiscal 2008 Annual Report, Defendants acknowledged that "a decrease in our market capitalization below our book value for a sustained period of time" is an indicator of possible goodwill impairment. Nonetheless, Defendants improperly delayed the recognition of A&P's goodwill impairment until the end of its third fiscal quarter of 2009 and falsely represented that the Price Impact segment's goodwill could withstand a 25% decrease in its fair value before an impairment charge was necessary.

65.    By doing so, Defendants materially overstated A&P's operating results and misled investors about the Company's true financial condition.  Defendants were motivated to delay the goodwill impairment charge in order to enable A&P to complete the 2015 Notes Offering on August 4, 2009 – at a time when the Company was in desperate need of capital – thereby raising $260 million in proceeds, which A&P would otherwise have been unable to obtain on favorable terms, if at all.

### A&P's Turnaround Efforts Were Not Meeting with Success and Were Constrained by the Company's High Rate of Cash Burn and Worsening Liquidity Crisis

66.    Throughout the Class Period, Defendants represented to investors that A&P was implementing a turnaround plan, when in truth, the Company's operational and financial condition were continuing to rapidly deteriorate, and A&P's turnaround efforts were constrained by the Company's high rate of cash burn and worsening liquidity crisis.

67.    According to CW1, A&P was struggling by the start of the Class Period with an extremely high rate of cash burn that averaged approximately $10 million per week.  As a consequence, the $430 million in capital raised at the start of the Class Period provided only a temporary reprieve.

68.    Indeed, A&P's cash flow was so constrained during the Class Period that unbeknownst to investors, the Company had stopped making lease payments on many of its "dark stores."  Dark stores are properties where A&P has ceased operating, but is still liable for lease payments under long-term leases.  At the time of A&P's bankruptcy filing, its dark store lease liabilities totaled $77 million per year.

69.    In 2007, A&P vacated 66 stores in the Midwest, which the Company had operated under its former "Farmer Jack" trade name.  According to a November 29, 2010 article in *Crain's Detroit Business*, in June 2010, A&P informed landlords at the Farmer Jack dark stores, including

27 stores in metro Detroit, that A&P was halting its lease payments, prompting lawsuits against A&P by nearly all of the landlords.  A commercial real estate broker in Detroit also filed suit against A&P, alleging that A&P had failed to pay him a commission due for a sublease signed on a dark store site.  A&P, however, did not disclose to investors during the Class Period that it was simply not paying its dark store lease obligations, or that a multitude of lawsuits had been brought against the Company as a result.

70.     In addition, during the Class Period, A&P's suppliers and other vendors had begun requiring A&P to pay in cash upon delivery due to increased concerns about the Company's creditworthiness, thereby increasing A&P's rate of cash burn and contributing to a worsening liquidity crisis.  By the summer of 2010, A&P's primary inventory supplier, C&S Wholesale Grocers ("C&S") was requiring cash upon delivery.

71.     As late as October 22, 2010, Defendants were telling investors that A&P's turnaround plan was progressing, that the Company's rate of cash burn was slowing, and that A&P would be able to secure additional financing to fund the turnaround.  In truth, Defendants – including Burkle and Yucaipa – knew that A&P's Chapter 11 filing was both imminent and unavoidable.

72.     By that time, Yucaipa had begun to accrue a large stake in A&P's debt by purchasing the 11.375% Notes due 2015 – which Burkle had insisted that A&P offer as a condition to Yucaipa's investment in A&P at the start of the Class Period.  Burkle expected that holders of the 11.375% Notes would receive high priority during a Chapter 11 restructuring, due to the notes' secured payment terms and high interest rate, and knew that holding the 11.375% Notes would therefore position Yucaipa to take control of A&P during its Chapter 11 reorganization.

### Knowing that A&P Is Headed for Bankruptcy, Yucaipa Accrues a Large Stake in A&P's Debt

73.     On December 10, 2010, the last day of the Class Period, investors learned that A&P would be filing for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

That same day, Reuters reported that Yucaipa had increased its debt position in the months leading up to the anticipated bankruptcy of the Company, as a means of taking control of A&P. The Reuters report stated, in pertinent part, the following:

> *[A&P's] biggest stockholders are activist investor Ron Burkle and the German retail group Tengelmann. Burkle's Yucaipa investment firm has built up a large position in the company's debt recently, putting it in a stronger position to take control of the company if it enters bankruptcy as part of the restructuring, people familiar with the firm's activities said.*

74.    Likewise, Dow Jones News Service cited reports from bond traders that Yucaipa had been buying up A&P's 11.375% Notes in the months prior to the Company's Chapter 11 filing – the same notes which Yucaipa had insisted that A&P offer as a condition to Yucaipa's equity infusion at the start of the Class Period. According to the Dow Jones article, "Investors believe A&P's 11.375% second-lien notes due 2015 will become the fulcrum security in bankruptcy, meaning their holders will receive the equity in the new company while more senior lenders are made whole and lower-ranked creditors could lose most or all of their investment."

75.    Anthony Sabino, a law professor at St. John's University, explained Burkle's strategy to take control of A&P in a December 14, 2010 Daily Deal article, as follows: "What Burkle is doing in these [bankruptcy] cases is buying up distressed debt. He starts off with a small portion of debt, but as the case evolves he can start to gobble up a more substantial portion," as other creditors "bail[] out" by selling their claims to Yucaipa.

## As Planned, Burkle and Yucaipa Take Control of A&P During Its Chapter 11 Reorganization

76.    Ultimately, Yucaipa's holdings in A&P positioned Burkle to take control of a restructured A&P, which is now poised to be more profitable after shedding the burdensome liabilities that contributed to its bankruptcy filing. Unbeknownst to investors during the Class Period, this was Burkle's aim all along.

77.    For example, A&P's Chapter 11 filing listed assets of $2.5 billion and liabilities of $3.2 billion, and cited a heavy debt burden of approximately $1 billion, lease obligations on closed stores, an unfavorable contract with the Company's primary inventory supplier C&S, and high labor costs for its largely unionized workforce as among the causes of A&P's bankruptcy. Over the course of the Chapter 11 proceedings, A&P closed 65 unprofitable stores, negotiated a new supply contract with C&S projected to save more than $50 million annually, obtained steep concessions from labor unions, cancelled dark store leases, and will exit Chapter 11 with approximately one-third of its previous debt.

78.    Also during the reorganization, the Company's majority shareholder Tengelmann was ousted, along with A&P's previous executive management, including Defendants Haub and Galgano – clearing the way for Burkle to take over as Chairman of a new board of directors. Tengelmann has now written off the entire amount of its holdings in A&P.

79.    On November 3, 2011, A&P announced that it had entered into an agreement to receive $490 million of debt and equity financing from Yucaipa, together with Mount Kellett Capital Management LP ("Mount Kellett") and funds managed by Goldman Sachs Asset Management, L.P. ("Goldman Sachs").[6] According to A&P, the investment would "form the basis of A&P's plan of reorganization" and "enable A&P to complete the restructuring of its balance sheet and emerge from Chapter 11 as a private entity in early 2012."

80.    Under the terms of the agreement, Yucaipa, Mount Kellett and Goldman Sachs will purchase $210 million in second-lien notes (at a 5% discount), $210 million in convertible third-lien notes and $80 million in new common stock, in exchange for receiving all of the equity in the newly-

---

[6]    Mount Kellett and Goldman Sachs collectively hold $368 million worth of A&P's convertible notes, approximately 80% of the total.

private A&P.  Yucaipa will also acquire warrants, exercisable for 10 years, to purchase 7% of A&P's new common stock on a fully diluted basis.

81.    The financing was contingent upon reaching a new collective bargaining agreement with the United Food and Commercial Workers International Union ("UFCW"), which would slash labor costs for the restructured A&P.  On November 14, 2011, the bankruptcy court approved the financing, subject to a revised collective bargaining agreement.

82.    The same day, A&P submitted its proposed reorganization plan to the bankruptcy court, which provided that the $490 million in proceeds from the financing agreement would be used to pay A&P's secured creditors in full – including holders of the 11.375% Notes, which Yucaipa had purchased prior to A&P's Chapter 11 filing.  The financing would also fund A&P's continued turnaround efforts and provide a $40 million fund for pro rata distribution to unsecured creditors, who would recover an average of 2.1% to 2.7% of their investments, while equity interests would be wiped out.

83.    Under the plan of reorganization, Burkle will serve as chairman of a new 7-member board of directors, and Goldman Sachs and Mount Kellett will each appoint two board members. The other board members will consist of Defendant Martin, (who will continue as CEO of the new company), and one board member appointed by UFCW.  On December 1, 2011, A&P announced that UFCW had approved a modified collective bargaining agreement, allowing A&P to move forward with its restructuring plan.

84.    On January 18, 2012, A&P announced that it had secured $750 million in bankruptcy-exit financing, consisting of a $400 million first-lien revolving credit facility and a $350 million first-lien term loan secured by A&P's assets.  J.P. Morgan Chase & Co. and Credit Suisse AG arranged the loans and agreed to commit $75 million and $25 million, respectively, for the revolver, while the remaining $650 million would be syndicated to other financial institutions.

85.    On February 28, 2012, the bankruptcy court approved A&P's plan of reorganization, enabling A&P to emerge from Chapter 11 as a private company controlled by Burkle.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

86.    The Class Period begins on July 23, 2009.  On that date, A&P issued a press release announcing its financial results for the first fiscal quarter of 2009, ended June 20, 2009.  In addition, the Company announced a "Major Investment Agreement," which was supposed to "strengthen [the Company's] balance sheet" and result in "significantly increased liquidity available to pursue its business strategy[.]"  The press release stated, in pertinent part, the following:

> [A&P] today announced the execution of investment agreements between the Company and affiliates of The Yucaipa Companies, LLC ("Yucaipa"), and partners of Tengelmann Warenhandelsgesellschaft KG ("Tengelmann") whereby Yucaipa will invest $115 million and Tengelmann will invest $60 million for a total purchase of $175 million of convertible preferred stock pursuant to a private offering.

> *With these new funds, A&P will be able to strengthen its balance sheet and have significantly increased liquidity available to pursue its business strategy thereby better positioning the Company to compete in the dynamic food retail industry*.  Under the terms of their agreements, Yucaipa and Tengelmann will purchase 115,000 and 60,000 shares of convertible preferred stock, respectively, each with an initial liquidation preference of $1,000.  On a fully diluted basis, Tengelmann will remain the largest single shareholder with an ownership interest of 38.6 percent, with Yucaipa's ownership interest increasing to 27.6 percent.  In connection with the preferred stock investment, A&P's Board of Directors will be comprised of the nine current directors plus two additional directors nominated by Yucaipa.

> *This transaction is conditioned upon*, among other customary conditions set forth in the investment agreements, *the completion of a private placement of the senior secured notes* which the Company announced separately today.

> The preferred stock has an 8 [percent annual] dividend payable quarterly in cash, or a 9.5 percent annual dividend if paid in additional preferred stock, and is convertible, under certain conditions, at an initial conversion price of $5.00 per share.  This represents a premium of approximately 7.5% . . . to yesterday's closing sale price of A&P's common stock of $4.65.  Tengelmann and Yucaipa, as holders of the preferred shares, will have the right to vote together with the holders of Common Stock on all matters upon which the holders of Common Stock are entitled to vote, on an as-converted basis, subject to certain [NYSE] stockholder approval requirements.

87.    Commenting on the transaction, Defendants Haub and Claus, each stated, in pertinent part, as follows:

Defendant Haub:

This investment further solidifies Tengelmann's over 30 year commitment to the Company's success. ***Partnering with Yucaipa is an exciting opportunity to collaborate with one of the most successful investors in the supermarket industry, Ron Burkle. We believe this strategic partnership has the potential to unlock significant shareholder value and I look forward to working with Ron to make this a reality***.

\*        \*        \*

The current challenging economy continues to impact our business. However, ***we are confident that our business optimization initiatives supported by our strategic investment agreements will benefit the Company and allow us to mitigate some of the difficulties we are experiencing***. . . .

Defendant Claus:

This deal reconfirms Tengelmann's long-standing commitment to this Company and our strategic plans. ***The addition of Yucaipa as a significant investment partner provides the necessary resources to successfully execute our strategies and navigate through this difficult economy effectively with a focus on building sustainable profitability in the longer-term[.]***

88.    With respect to the Company's financial results for the first fiscal quarter of 2009, the press release stated, in pertinent part, as follows:

Sales for the first quarter were $2.8 billion versus $2.9 billion last year. Comparable store sales decreased 3.3%. For the first quarter, excluding non-operating items, adjusted EBITDA[7] was $80 million versus $96 million last year. Adjusted income from operations was $2.3 million versus $16.2 million in last year's first quarter. . . . Reported loss from continuing operations was $58.3 million compared to income of $2.8 million for last year's first quarter.

89.    The same day, A&P filed its quarterly report for the first fiscal quarter of 2009 with the SEC on Form 10-Q (the "First Quarter Form 10-Q"). The First Quarter Form 10-Q, which was

---

[7]    "EBITDA" stands for earnings before interest, taxes, depreciation, and amortization.

signed by Defendants Claus and Galgano, repeated A&P's financial results for the first fiscal quarter of 2009, which were represented to have been prepared in conformity with GAAP.  With respect to A&P's goodwill, the First Quarter Form 10-Q stated, in pertinent part, as follows:

> The latest impairment assessment of goodwill and indefinite lived intangible assets was completed in the fourth quarter of fiscal 2008 and concluded there was no impairment as of February 28, 2009.  ***We considered whether there have been any triggering events requiring an interim impairment test and concluded that another impairment analysis was not required in the first quarter of fiscal 2009***; however, we will continue to monitor actual results and projections and if we experience a continued decline in operations, an impairment charge may be required in the future.

90.    Also on July 23, 2009, A&P issued a press release announcing the proposed private placement offering of $225 million in senior secured notes due 2015, which the "Major Investment Agreement" with Yucaipa and Tengelmann, announced that day, was contingent upon.  The press release stated, in pertinent part, as follows:

> [A&P] today announced that, subject to market and other conditions, it plans to offer $225 million aggregate principal amount of senior secured notes due 2015 (the "Notes").  The Notes will be second lien secured obligations of A&P, guaranteed by all of the Company's domestic subsidiaries.  The Notes will bear interest at a fixed rate payable semi-annually in cash.  A&P intends to use all of the net proceeds of the offering to repay borrowings under its existing credit facility and for general corporate purposes.
>
> The Notes are being offered only to qualified institutional buyers in reliance on Rule 144A under the Securities Act of 1933, . . . and outside the United States, only to non-U.S. investors pursuant to Regulation S.

91.    In response to these announcements, the price of A&P common stock rose nearly 15% on heavy trading volume, to close at closing at $5.33 per share compared to the prior day's close of $4.65 per share.

92.    On July 30, 2009, when the notes were priced, at 11.375% as a result of strong demand, the principal amount of the offering was raised to $260 million, as compared to the $225 million announced on July 23, 2009.

93.     On August 4, 2009, A&P issued a press release announcing the successful completion of the investment agreement with Tengelmann and Yucaipa and the corresponding 2015 Notes Offering, both announced on July 23, 2009.  The press release represented that the newly-raised capital would "significantly strengthen" the Company as well as accelerate the turnaround of its Pathmark operations, and described the transactions, in pertinent part, as follows:

> [A&P] announced today that affiliates of . . . Yucaipa . . . invested $115 million in A&P by purchasing 115,000 shares of A&P's newly created 8.0% Cumulative Convertible Preferred Stock, Series A-Y pursuant to an investment agreement executed among Yucaipa and A&P dated as of July 23, 2009.  In addition, partners of Tengelmann . . . invested $60 million in A&P by purchasing 60,000 shares of A&P's newly created 8.0% Cumulative Convertible Preferred Stock, Series A-T pursuant to an investment agreement executed among partners of Tengelmann and A&P dated as of July 23, 2009.  A total of $175 million was invested in A&P pursuant to a private offering.  At the same time, A&P announced today the completion of its previously announced offering of $260 million of 11.375% senior secured notes due 2015 (the "Notes"), ***successfully accomplishing a fund raising effort resulting in gross proceeds to the Company of $435 million.***
>
> ***The injection of $175 million of equity capital, combined with raising $260 million through the issuance of the Notes, significantly strengthens A&P's balance sheet and provides additional liquidity for the Company to pay down a portion of its senior credit facility and compete in the dynamic food retail industry.***
>
> *        *        *
>
> ***In connection with the preferred stock investment, A&P's Board of Directors added two new members to its board of directors***, bringing the size of the board of directors to eleven. The new board members include Mr. Terrence Wallock and Mr. Frederic ["Jake"] Brace, ***each elected by Yucaipa***. . . .

94.     The press release also contained the following commentary on the new partnership with Yucaipa:

> ***The equity investments bring together two of the most prolific investors in the US grocery retail industry***: Tengelmann, one of the world's largest family owned operators of diversified retail businesses comprising global revenues in excess of $35 billion; and Yucaipa, one of the most successful investors in the US supermarket industry in the last 15 years.  Together they will provide A&P with unparalleled knowledge, resources and expertise in this difficult environment.  ***This relationship is expected to enable A&P to accelerate its format optimization strategy, drive the implementation of its business improvement initiatives and facilitate the turnaround of its Pathmark business.  The new funds provide the Company***

*significant additional cash resources to successfully execute its strategies and navigate through this difficult economy effectively with a focus on building sustainable profitability in the longer-term.*

<u>Defendant Haub:</u>

Working together with Yucaipa is an exciting opportunity to collaborate with one of the most successful investors in the supermarket industry.  I have enjoyed a productive relationship with Ron Burkle for many years and *I believe that together we will drive significant performance improvement in the business and realize the tremendous potential and strategic value of A&P.*

95.     The statements referenced above in ¶¶86-90 and ¶¶93-94 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that A&P had not formed a "partnership" with Yucaipa that would benefit the Company's shareholders, because Yucaipa was actually vying for control of A&P and planned to steer the Company's reorganization once it filed for Chapter 11, which Defendants knew was likely;

(b)     that Yucaipa had insisted upon the 2015 Notes Offering as a condition to its initial investment in A&P, so that it could position itself to take control of A&P in the event of a Chapter 11 restructuring by purchasing the 11.375% Notes;

(c)     that the Pathmark acquisition was a complete disaster for the Company as Pathmark's operations were in far worse condition than had been represented to investors;

(d)     that A&P was improperly delaying recognizing a $321.8 million impairment charge to the value of Pathmark's goodwill, and as a result, A&P's reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP; and

(e)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its relationship with Yucaipa, and its operations and prospects.

96.     On October 20, 2009, A&P issued a press release announcing its financial results for the second fiscal quarter of 2009, the period ended September 12, 2009. The press release stated, in pertinent part, as follows:

> Sales for the second quarter were $2.1 billion versus $2.2 billion last year. Comparable store sales decreased 3.8%. For the second quarter, excluding non-operating items, adjusted EBITDA was $64 million versus $67 million last year. Adjusted income from operations was $6.0 million versus $6.3 million in last year's second quarter. . . . For the second quarter, reported loss from continuing operations was $62.2 million compared to a loss of $4.3 million last year, which includes a $50.0 million increase in non cash mark to market adjustments related to financial liabilities.

97.     The press release also announced that Defendant Claus, A&P's President and CEO, was "leaving the Company effective immediately" and that Defendant Haub, the Executive Chairman of the Board, would assume the additional role of interim CEO until A&P appointed a successor. Defendant Haub, commenting on the Company's financial results, stated, in pertinent part, as follows:

> The current challenging economy continues to impact our business. The macro headwinds including rising unemployment, intensifying price competition and now also deflation are creating an even more difficult short-term economic environment. ***Nonetheless, we have made progress in several of our formats and many of our initiatives***.
>
> *         *         *
>
> ***Securing over $400 million in new funds was clearly done at the right time to ensure that we have the resources to address future debt maturities and to invest in our optimization strategies. In addition our working relationship with Yucaipa is off to a great start as we continue to look at ways to improve our overall business strategy***.
>
> We believe that once the economy improves ***these strategies will position us well to realize the tremendous strategic value of the company and to capitalize on our leadership position in the Northeast***.

98.     Later that day, Defendants held a conference call with analysts and investors, during which they made additional positive comments about the capital that A&P had recently raised, stating, in pertinent part, as follows:

Defendant Haub:

As you remember, in late July we announced the execution of two investment agreements with Yucaipa and Tengelmann for $175 million of convertible preferred stock as well as the launch of a high yield debt offering.

In early August, we closed on all these transactions and raised gross proceeds of $435 million, *representing a significant strengthening of the Company's balance sheet. Both Yucaipa and Tengelmann believe that investing these funds in A&P in combination with the senior secured notes has put the Company in a great position to pursue its format, strategy and strengthen its strategic position in the northeast while at the same time addressing the financial needs and reducing its overall leverage*.

<center>*        *        *</center>

*With the investments by Tengelmann and Yucaipa, our Company has made a major step forwards improving its balance sheet, securing additional liquidity and addressing its financial needs. Now, A&P will be able to focus on improving its operations and realizing the benefits of its many opportunities and driving its format strategy. A&P remains in a very strong strategic position and believes that with the support of Yucaipa, it will successfully manage through the current major recession and emerge a much stronger player in the northeast supermarket industry* once the economy recovers. While the operating environment continues to deteriorate in the short-term, we are determined to take whatever actions are necessary to stem the negative performance but at the same time stay focused on the longer term opportunities we have identified. *I am today more confident about A&P's future and look forward to realizing the full potential of the Company and working together with Ron Burkle and Yucaipa to create significant shareholder value in the next several years*. . . .

Defendant Galgano:

Turning to our balance sheet, I'm very pleased with our recent capital raise which consisted of $260 million of 11.375% senior secured notes due 2015 and $175 million at 8% cumulative convertible preferred shares. *These finances have certainly bolstered our liquidity and provide flexibility to address our short and mid term financing needs including our outstanding convertible notes*. . . .

99.    Also on October 20, 2009, A&P filed its quarterly report for the second fiscal quarter of 2009 with the SEC on Form 10-Q/A. The Second Quarter Form 10-Q/A, which was signed by Defendants Haub and Galgano, repeated A&P's financial results for the second fiscal quarter of 2009, which were represented to have been prepared in conformity with GAAP. The Second Quarter Form 10-Q/A also represented that the Company's Price Impact segment could withstand an

<center>- 31 -</center>

incremental 25% decrease in its fair value before the segment's goodwill would suffer an impairment in value, stating, in pertinent part, as follows:

> As disclosed in Form 10-Q for our first quarter ended June 20, 2009, we continue to monitor actual results and projections for the necessity of a possible impairment charge.  Due to the severity and duration of operating losses within the Price Impact reporting unit, we have reduced our shorter term internal revenue and profitability forecasts and revised our operating plans and cash flow projections.  Even though our business outlook has worsened due to the current economic recession, *we determined that a hypothetical decrease in fair value of over 25% would be required before the Price Impact reporting unit would have a carrying value in excess of the fair value. Despite unfavorable operating results within the Price Impact reporting unit, we do not believe the long-term value of the reporting unit has been reduced to below its carrying value and therefore, there has not been a triggering event requiring us to perform an interim goodwill impairment analysis at this time.*

100.    The statements set forth above in ¶¶96-99 were each materially false and misleading when made for the reasons stated in ¶95.

101.    On January 12, 2010, A&P issued a press release announcing its financial results for the third fiscal quarter of 2009, ended December 5, 2009.  The press release also announced a sudden impairment charge of $412.6 million, stating, in pertinent part, as follows:

> Sales for the third quarter were $2.0 billion versus $2.1 billion last year.  Comparable store sales decreased 5.8%.  For the third quarter, excluding non-operating items, adjusted EBITDA was $36 million versus $78 million last year.  Adjusted loss from operations was $20.1 million versus adjusted income from operations of $17.4 million in last year's third quarter. . . . *For the third quarter, reported loss from continuing operations was $502.4 million which includes charges of $412.6 million for goodwill, trademark and long-lived asset impairment and $16 million for mark to market adjustments related to financial liabilities.*  Loss from continuing operations in the comparable period of the prior year totaled $3.8 million, and included income of $23 million for mark to market adjustments related to financial liabilities.

102.    Defendant Haub commented on the Company's financial performance, in pertinent part, as follows:

> *Since assuming the role of interim CEO, I have launched efforts to assess all aspects of our business and to develop initiatives to improve our performance in the short term.  During this important process, we have been fully engaged with Yucaipa and have leveraged their significant skills and industry expertise.*  We have determined that our previous merchandising and marketing programs did not

meet the consumer's changing needs. As a result, we have been changing our go-to-market direction and implemented a number of initiatives to mitigate the negative external influences and provide our customers with better value, service and quality products.

*This quarter marks the transition to a different approach which we expect will translate to improved performance in the coming months. At the same time, we are working together with Yucaipa to develop longer-term strategies to drive sustainable success in the future. These efforts combined with our strong strategic position in the Northeast, our superior store base and our resolve to implement strategic changes makes me confident in the Company's long-term prospects*.

103.    Following the press release, A&P held a conference call with analysts and investors, during which Defendant Galgano explained that the nearly $413 million impairment charge was related to the ailing Pathmark business, stating, in pertinent part, as follows:

Defendant Galgano:

First, we recorded impairment charges related to Pathmark, long-lived and intangible assets based on updated valuations. *Given the continued difficult environment and the decline in our Pathmark results*, current fair market valuations are very low, resulting in calculated valuations below our book values on certain assets. As such, *we have recorded a total charge of $413 million to write down the value of certain Pathmark long-lived assets, the Pathmark trade name, and the value of goodwill for the Pathmark segment.*

104.    Also during the call, Defendant Haub commented on A&P's efforts to improve its operational and financial performance, stating, in pertinent part, as follows:

Moving forward, our immediate focus is to get more customers back into our stores, generate more profitable sales, and reduce expenses. I view this interim period before a new CEO has been appointed as a critical time for the Company to get its house in order. This transition period is an opportunity for us to make fundamental improvements to the business, which will provide the new CEO with a more solid foundation to continue with the short-term turnaround strategy we have developed and then add a long-term growth strategy thereafter. *I believe we now have the right platform in place to drive the necessary performance improvements in the coming year.*

From here, we will work together with the new CEO to ensure we ultimately achieve what we plan to accomplish when we made the acquisition of Pathmark to become a power house in the Northeast. This remains our goal for the next couple of years. For this, *please bear in mind that while this quarter's results are poor, they are not indicative of our future performance and do not constitute a new norm we base our future projections on.* We have done a significant review of the business, which

turned up many areas in which we can and will do much better going forward. *We implement[ed] lot of changes already during the third quarter, and we are in the process of stabilizing the business and are already experiencing some of the improvements from the initiatives we executed. I'm increasingly confident that we can deliver improved results in the fourth quarter.*

\*       \*       \*

*The past quarter marks an important turning point in the fortunes of the Company, with the outstanding support of . . . Yucaipa, we've been able to identify significant improvement potential and we have moved quickly and decisively to institute critical performance improvement initiatives throughout the business that will improve results in the short-term*. I'm confident that we will have a highly qualified and competent CEO in place at the beginning of our new fiscal year to lead the Company's turnaround. *A&P remains in a very strong strategic position, and I believe that with the support of Yucaipa, it will successfully manage through the current major recession and emerge a much stronger player in the Northeast supermarket industry. I remain confident about A&P's future and look forward to realizing the full potential of the Company and working together with Yucaipa to achieve significant shareholder value in the next several years*.

105.    In a Form 10-Q filed with the SEC the same day, A&P disclosed that $321.8 million of the $412.6 million charge associated with the Pathmark business was attributable to an impairment of the entire amount of goodwill reported in A&P's Price Impact segment.

106.    In response to the announcement of the belated impairment charge for the Pathmark business' goodwill – which the Company should have recognized no later than the first fiscal quarter of 2009, as set forth in ¶¶49-65 above, the price of A&P common stock plummeted nearly 21%, from a closing price of $12.88 per share on January 11, 2010, to close at $10.22 per share on January 12, 2010, on unusually heavy trading volume of more than 3 million shares traded. The price of A&P common stock declined an additional 15% over the next five trading days, as the market digested the import of A&P's massive goodwill impairment charge associated with its Pathmark business, closing at $8.66 per share on January 20, 2010.

107.    The statements referenced above in ¶¶101-05 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)      that A&P had not formed a "partnership" with Yucaipa that would benefit the Company's shareholders, because Yucaipa was actually vying for control of A&P and planned to steer the Company's reorganization once it filed for Chapter 11, which Defendants knew was likely;

(b)      that Yucaipa had insisted upon the 2015 Notes Offering as a condition to its initial investment in A&P, so that it could position itself to take control of A&P in the event of a Chapter 11 restructuring by purchasing the 11.375% Notes;

(c)      that the Pathmark acquisition was a complete disaster for the Company as Pathmark's operations were in far worse condition than had been represented to investors; and

(d)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its relationship with Yucaipa, and its operations and prospects.

108.    On January 27, 2010, A&P issued a press release announcing that Ron Marshall, who had previously served as Executive Vice President and CFO of Pathmark, would assume the role of A&P's President and CEO, effective February 8, 2010.

109.    On May 5, 2010, A&P issued a press release announcing its financial results for the fourth fiscal quarter and full year of 2009, ended February 27, 2010.  For the quarter, the Company reported sales of $2.0 billion, compared to sales of $2.3 billion during the fourth fiscal quarter of 2008, and a 4.8% decrease in comparable store sales.  Adjusted EBITDA was $41 million versus $86 million during the fourth fiscal quarter of 2008, adjusted loss from operations was $13 million, as compared to adjusted income from operations of $26 million during the previous year's fourth fiscal quarter, and reported loss from continuing operations was $158 million, as compared to a loss from continuing operations of $84 million in the fourth fiscal quarter of 2008.

110.    For the full fiscal year of 2009, A&P reported sales of $8.8 billion, as compared to sales of $9.5 billion during fiscal 2008, and a 4.3% year-over-year decrease in comparable store

sales.  Adjusted EBITDA was $224 million versus $333 million during fiscal 2008, and adjusted loss from operations was $22 million, as compared to adjusted income from operations of $72 million during the previous fiscal year.  The Company also reported a loss from continuing operations of $781 million during fiscal 2009 (including charges of $477 million for goodwill, trademark and long-lived asset impairment and expenses of $9 million for mark to market adjustments related to financial liabilities), as compared to a loss from continuing operations of $90 million during the previous fiscal year.  Defendant Marshall commented on the results, stating, in pertinent part, as follows:

> The past year was certainly a challenge, as the economy continued its sluggish pace. ***The good news is that we have identified several critical issues within our organization that will lead us back to market prominence***.  We are committing our undivided attention to clarifying our brand identity in our principal banners, completing the integration of the Pathmark acquisition and maximizing supply chain cost improvement opportunities.
>
> *        *        *
>
> ***The fixes in our Company are attainable and the initiatives are in place today to provide us the path forward***.  Concurrent to transforming the culture of our Company, ***we are gaining ground in better understanding our customer, developing the skills critical for our success, making prudent reinvestments in our business and reducing costs through a process of continuous improvement***.  Our sole mission is to make The Great Atlantic & Pacific Tea Company great, again.

111.    The following day, on May 6, 2010, A&P filed its Form 10-K with the SEC, which confirmed A&P's previously announced financial results and was signed by Defendants Haub, Marshall, and Galgano.

112.    The statements set forth above in ¶¶109-11 were each materially false and misleading when made for the reasons stated in ¶107.

113.    On July 23, 2010, A&P issued a press release announcing that the Company had appointed Defendant Martin as President and CEO, following the unscheduled departure of Defendant Marshall after less than six months at the Company.  The press release also announced

A&P's financial results for the first fiscal quarter of 2010, ended June 19, 2010, and stated that the Company had launched a "turnaround," designed to strengthen A&P's operational and financial foundation. With respect to the Company's first quarter financial results, the press release stated, in pertinent part, as follows:

First Quarter 2010 Financial Highlights

Sales for the first quarter were $2.6 billion versus $2.8 billion in last fiscal year's first quarter. Comparable store sales decreased 7.2%.

Excluding non-operating items, adjusted EBITDA was $19 million versus $81 million for last fiscal year's first quarter.

Adjusted loss from operations was $51 million versus adjusted income from operations of $4 million in last fiscal year's first quarter.

For the first quarter, reported loss from continuing operations was $116 million which includes charges of $5 million for long-lived asset impairment and income of $8 million for mark to market adjustments related to financial liabilities.

Loss from continuing operations in last year's first quarter totaled $58 million and included losses of $2 million for mark to market adjustments related to financial liabilities.

114. Defendant Haub commented on the Company's announcements, in pertinent part, as follows:

*The Board and the company's major shareholders, Tengelmann and Yucaipa, have been instrumental in developing what I believe is the right turnaround strategy for A&P*. As we moved to the implementation and execution stage of this comprehensive operational and revenue-driven turnaround, the Board determined that the company needed a leader at the helm with the skill set Sam Martin possesses. Sam is a proven, hands on operational expert in the food retail industry. He has an ideal mix of food industry management experience encompassing operations, merchandising and supply chain. *We are confident that he will successfully drive the rapid implementation of our multi-faceted effort to make A&P a stronger and more efficient company*. We thank Ron Marshall for his service and wish him well in his future endeavors.

\*     \*     \*

*Although we are clearly disappointed with our performance in the first quarter, we are confident that we now have the right leadership in place to drive this operational and revenue-driven turnaround effort and make A&P a great company*

- 37 -

*again*.  We are focused on improving our customer value proposition, as well as significantly reducing our structural and operating costs.  Our progress on enhancing our customers' experience across our store formats illustrates our commitment to moving forward aggressively.  ***We remain steadfastly focused on taking the actions necessary to position A&P for a strong future***.

115.    With respect to the Company's "Turnaround Strategy," the press release stated, in pertinent part, as follows:

Turnaround Strategy

The comprehensive operational and revenue-driven turnaround initiative is designed to generate sustained profitability and cash flow, drive sales growth, restore competitive margins to the business and strengthen the foundation of the company for the long term.  The four key elements of the turnaround are:

- Improve the company's customer value proposition through merchandising;

- Enhance the customer experience and drive clear brand identity;

- Lower structural and operating costs; and

- Implement new financing initiatives to augment first quarter liquidity of $253 million.

In addition to its revenue-generation and cost reduction initiatives, the company is pursuing capital raising opportunities, including incremental financing through its current bank facility.  The company also is pursuing sale-leaseback transactions and the sale of certain non-core assets.

116.    Defendants Martin and Haub commented on the "Turnaround Strategy," in pertinent part, as follows:

Defendant Martin:

***I firmly believe that this turnaround will strengthen A&P's operating foundation and improve our performance***.  I have faced similar situations in my career and have successfully navigated through them.  ***We will move quickly to implement this turnaround for the benefit of all our stakeholders***.

Defendant Haub:

***I am confident that by executing on this far-reaching turnaround under Sam's leadership, we will strengthen the foundation of the company for the long term. Tengelmann and Yucaipa remain actively involved in our efforts to improve the***

- 38 -

*company's performance, and I am encouraged by their continued belief in the long-term value of their investment in A&P*.

117.    Later that day, Defendants held a conference call with analysts and investors, during which they provided assurances about A&P's ability to maintain sufficient liquidity to execute the turnaround plan:

Defendant Haub:

We clearly have a lot of work to do, but ***the Board, Tengelmann, Yucaipa and I are confident that under Sam's leadership we have developed the right approach to position the company to generate sustained profitability and cash flow, restore competitive margins to our business, and strengthen the foundation of the company for the long term***. This turnaround will be operational and revenue-driven, complemented by significantly lower structural and operating costs. ***We are confident that we will successfully augment our current liquidity to deal with our maturities and support the turnaround financially***.

Defendant Galgano:

We continued to assess our liquidity position in light of our 2011 debt maturities and are focused on cash-generating initiatives. In addition to our revenue-generation and cost-reduction initiatives, we are undertaking a number of capital-raising efforts. This includes incremental financing through our current bank facility, utilizing our over-collateralized asset base; sale-leaseback transactions; and the sale of certain non-core assets.

***We expect transactions such as these to improve liquidity, giving us the necessary runway to implement our turnaround and address our 2011 maturities***.

118.    During the call, analysts questioned Defendants about A&P's liquidity, and Defendants responded, in pertinent part, as follows:

Karen Short – BMO Capital – Analyst:

***So can we maybe just talk about liquidity a little bit more?*** . . . [Y]our EBITDA doesn't cover your cash interest, let alone CapEx and things like that. . . . I know you went through the $253 million, but if I do the math on where you kind of end up, ***you're going to need more than sale-leasebacks and non-core asset sales***.

Defendant Haub:

And I think we understand that, and we are focused on all the things that we need to do to raise financings to cover the needs of the business and to address the maturities that we have. And ***there is a very good effort underway, and I'm very encouraged***

- 39 -

*by the progress on all these different initiatives and the support of our lenders and our bank group, and we are confident that if we execute all these things, that we will be fine*.

Defendant Galgano:

Karen, in addition to the sales in non-core assets and the sale-leasebacks, I also referred to obtaining incremental financing through our current bank facility. Currently the borrowing base under that facility is a little bit over $500 million, and the value of the collateral under that facility is hundreds of millions higher than that, and it's in excess of $900 million. *So there is strong investor interest in some additional financing there. So that is something that we are seriously pursuing at the moment*.

<p align="center">*    *    *</p>

Karen Short – BMO Capital – Analyst:

Okay. And then on [then], your vendors, I know a vast majority of the credit is through C&S, but *can you maybe elaborate a little bit on how your vendors are feeling* in terms of the [DFD] ones? *Because I would imagine they would be a little nervous right now*.

Defendant Haub:

We have regular dialogue with all of our vendors, and that hasn't changed, and we don't foresee any of that changing. *They are focused on how they can play a role in the turnaround of the business and how they can build their business, and we communicate to them what we are working on and the progress we are making in the business. And so this has been a very collaborative and supportive ongoing relationship*.

119.    The statements referenced above in ¶¶113-18 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that A&P had not formed a "partnership" with Yucaipa that would benefit the Company's shareholders, because Yucaipa was actually vying for control of A&P and planned to steer the Company's reorganization once it filed for Chapter 11, which Defendants knew was likely;

(b)    that Yucaipa had insisted upon the 2015 Notes Offering as a condition to its initial investment in A&P, so that it could position itself to take control of A&P in the event of a Chapter 11 restructuring by purchasing the 11.375% Notes;

(c)    that the Pathmark acquisition was a complete disaster for the Company as Pathmark's operations were in far worse condition than had been represented to investors;

(d)    that A&P's ability to implement its turnaround efforts was constrained by the Company's high rate of cash burn and worsening liquidity crisis;

(e)    that A&P's vendors, including its primary supplier C&S, were requiring cash upon delivery by no later than the summer of 2010, thereby increasing the Company's rate of cash burn and contributing to A&P's liquidity crisis;

(f)    that A&P was failing to pay its lease obligations on "dark stores" by no later than June 2010; and

(g)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its relationship with Yucaipa, its turnaround efforts, and its operations and prospects.

120.    On August 13, 2010, A&P issued a press release announcing the closing of 25 stores as part of the Company's turnaround initiative.  Defendant Martin commented on the store closings, in pertinent part, as follows:

> As part of our turnaround, we have initiated a detailed review of our store footprint and have decided to close these 25 locations.  While this was a very difficult decision that will unfortunately impact some of our customers, partners, communities and employees, ***these actions are absolutely necessary to strengthen A&P's operating foundation and improve our performance going forward.***
>
> *              *              *
>
> ***We are moving forward aggressively to advance our turnaround and position A&P for a strong future.***  Even as we reduce our store base and drive efficiencies across our Company, A&P continues to remodel stores and take other important steps to enhance our customers' experience across our store formats. . . .

121.    The following month, on September 8, 2010, A&P announced the sale of seven additional stores located in Connecticut as part of the Company's "comprehensive turnaround strategy."

122.    The statements set forth above in ¶¶120-21 were each materially false and misleading when made for the reasons stated in ¶119.

123.    On October 21, 2010, A&P issued a press release announcing its financial results for the second fiscal quarter of 2010, ended September 11, 2010.  With respect to the Company's second quarter financial results, the press release stated, in pertinent part, the following:

Second Quarter 2010 Financial Results

Sales for the second quarter were $1.9 billion versus $2.1 billion in last fiscal year's second quarter.  Comparable store sales decreased 6.6 percent.

For the second quarter, reported loss from continuing operations was $143 million versus last year's second quarter reported loss from continuing operations of $62 million.

EBITDA was negative $45 million for the second quarter versus $42 million for the last fiscal year's second quarter.

Excluding certain non-cash and non-operating items . . ., adjusted EBITDA was $8 million versus $65 million for last fiscal year's second quarter.

Availability under the Company's credit facility was $181 million at the end of the second quarter.

124.    The press release also provided an "update" on the Company's purported progress in implementing its turnaround plan, including measures to strengthen A&P's liquidity, stating, in pertinent part, as follows:

***Initial Phase of Turnaround Completed with New Executive Team in Place***

***First Phase of Store Footprint and Cost Rationalization Completed***

\*        \*        \*

The Company's Turnaround Plan consists of five key building blocks, which include:

- Installing a strong management team;

- Strengthening liquidity;

- Reducing structural and operating costs;

- Improving the A&P value proposition for customers; and

- Enhancing the customer experience in stores.

<div align="center">*    *    *</div>

Since the end of the last quarter, A&P made a series of executive appointments that complete the leadership team under President and CEO Sam Martin and enable the Company to accelerate the implementation phases of its turnaround plan.

<div align="center">*    *    *</div>

***The Company is negotiating an agreement with its existing banks and several new lenders to add a new-money term loan to its existing asset-backed facility***. The new term loan is expected to be backed by, primarily, leasehold assets and other collateral not currently contained in the borrowing base. ***The complex structure of the new loan has pushed the closing off several weeks. The Company believes, however, that it will be able to close and fund the transaction***.

<div align="center">*    *    *</div>

A&P continues to pursue additional financing initiatives including sale-leaseback transactions and sales of additional non-core and/or non-performing assets, as well as reviewing our store portfolio for additional opportunities.

125.    Defendants Martin and Haub commented on the turnaround plan, in pertinent part, as follows:

<u>Defendant Martin</u>:

Our second quarter financial results are disappointing. But, ***we have developed a comprehensive turnaround plan and have quickly begun to implement it.*** The first step in that plan is the formation of a new management team. ***With our talented and deeply experienced new team now in place, we have begun to execute against the other steps in the plan on an accelerated basis.***

<div align="center">*    *    *</div>

Since I joined A&P in late July, *we have moved quickly to implement our comprehensive turnaround plan[.]* . . . Although we clearly have a lot of work ahead of us, *we have already made solid initial progress*.

\* \* \*

Defendant Haub:

The Board and I are encouraged by the initial actions taken by Sam and his new executive team to strengthen A&P's operating foundation. **The Board and the Company's major shareholders, Tengelmann and Yucaipa, have full confidence that this team will continue to make significant, incremental progress in executing our turnaround plan for the benefit of all our stakeholders.**

126.    The following day, on October 22, 2010, Defendants held a conference call with analysts and investors, during which they made additional assurances about the progress on the turnaround plan and efforts to strengthen A&P's liquidity, stating, in pertinent part, as follows:

Defendant Martin:

*The results of this plan are beginning to materialize and will continue to grow in magnitude throughout the second half of 2010 and into 2011 and 2012.*

Defendant Brace:

When we do close and fund the [new-money term loan] transaction, *this loan will create a significant amount of liquidity and provide us the time necessary to make the needed changes to our business*.

\* \* \*

While our second-quarter financial results were not good, *we have seen positive changes from our turnaround efforts to date, and we are confident that we will continue to see progress in the quarters to come*.

127.    During the call, analysts continued to press Defendants about A&P's liquidity, and Defendants provided the following reassurances:

Karen Short – BMO Capital – Analyst:

Okay, and then, I guess just turning to liquidity, if I do the math on your revolver balance, your cash balance, what you might generate in EBITDA this year, and then taking away your cash interest, your CapEx and your dark store leases, obviously *by the end of this year you're pretty tight on liquidity* – I mean, not zero, but kind of

$45 million.  Does that sound reasonable, excluding any additional availability on your revolver and asset sales?

Defendant Brace:

. . . ***We think we have some very significant opportunities to improve our liquidities*** in the way that I mentioned on the call through expanding our bank facility, through sale leasebacks and other transactions related to non-core assets.

The liquidity is obviously important because the changes that we are making will both take some time and some of them may actually require some investment.  So to accomplish all that, to buy the time and to have the liquidity to make any investments we need to improve on our liquidity.

But we don't provide any forecasts, but ***we are feeling very comfortable that we're going to be able to get to the place where we have the liquidity we need to execute on the rest of the plan***.

<div align="center">*        *        *</div>

Joe Stauff – Susquehanna – Analyst:

. . . [I]s there any other collateral that you can pledge in the context of – I am trying to anticipate how big the new bank facility could be.  ***Is it going to replace the entire bank facility now or is it just going to be an incremental piece?*** . . .

Defendant Brace:

. . . I mentioned it in my prepared remarks, ***there is some collateral that is not currently part of the borrowing base that we think can be used to – as part of the overall ABL facility to create another tranche, a new-money term loan, as I described it, that is supported by that collateral***.

Now, as I mentioned in my prepared remarks as well, the structuring of that – and its real estate intensive nature makes it something that is logistically more difficult to do than initially thought.  ***It just takes a lot of time to work through all the real estate issues, and that is what we are doing.***

***But as to the size, it is a significant size.  I don't want to pin a number on it, but I can tell you that it is probably the largest aspect of our liquidity plan***.

<div align="center">*        *        *</div>

. . . I said in my prepared remarks that we were going to do it before too long and ***we think we can do it in weeks, not months.***

<div align="center">*        *        *</div>

<div align="center">- 45 -</div>

<u>Joe Stauff – Susquehanna – Analyst</u>:

. . . [R]elative to the estimated amount of financing that you're going to get in the context of new facility, . . . relative to your financial cushion . . . ***how long do you think it will take before all these initiatives*** . . . that you have put in place recently in the last couple of months, do you think could ***start really eating into that quarterly cash burn number?***

<u>Defendant Martin</u>:

Okay, so my expectation really is that ***we started eating it into that in this quarter.*** So to the extent that we are able to execute on our merchandising and marketing initiatives, to the extent we can begin some structural – which we have begun some structural cost reductions, to the extent that we do have some other liquidity building, if you will, initiatives, ***all of these five, if you will, building blocks of our turnaround plan work in concert, and have begun.***

***So there is progress on all five building blocks***. And certainly to the extent that we see progress, ***I expect the third quarter should show us progress on this burn rate***.

128.    Also during the call, when an analyst asked about A&P's payments on dark store leases, Defendant Brace responded, in pertinent part, as follows:

. . . ***[W]e have an ongoing program to minimize our dark store payments***. . . . Some of it, quite frankly, can be lumpy ***as we come to certain arrangements with our landlords*** and things like that. But ***we are focused solely on the cash flow related to that and trying to, obviously, minimize any negative cash flow related to dark stores***.

129.    On November 9, 2010, A&P announced the sale of six Pathmark stores for $89.8 million, exclusive of closing costs, which A&P would then lease back from the buyer. Defendant Martin described the transactions as "another step forward in our comprehensive turnaround strategy" which would "further strengthen our financial foundation and improve our performance[.]"

130.    The statements referenced above in ¶¶123-29 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that A&P had not formed a "partnership" with Yucaipa that would benefit the Company's shareholders, because Yucaipa was actually vying for control of A&P and planned to

steer the Company's reorganization once it filed for Chapter 11, which Defendants knew was imminent;

(b)    that Yucaipa had insisted upon the 2015 Notes Offering as a condition to its initial investment in A&P, and was now purchasing large quantities of the Company's debt – including the 11.375% Notes – so as to position itself to take control of A&P once it filed for Chapter 11;

(c)    that the Pathmark acquisition was a complete disaster for the Company as Pathmark's operations were in far worse condition than had been represented to investors;

(d)    that A&P's turnaround efforts were not meeting with success, and were constrained by the Company's high rate of cash burn and worsening liquidity crisis;

(e)    that A&P's vendors, including its primary supplier C&S, were requiring cash upon delivery by no later than the summer of 2010, thereby increasing the Company's rate of cash burn and contributing to A&P's liquidity crisis;

(f)    that A&P was failing to pay its lease obligations on "dark stores" by no later than June 2010;

(g)    that due to Company's very poor credit rating, combined with tight global credit markets, there was no realistic possibility of securing the financing necessary to maintain A&P's liquidity; and

(h)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its relationship with Yucaipa, its turnaround efforts, and its operations and prospects.

131.    On Friday December 10, 2010, investors were stunned to learn for the first time that A&P was performing so far below expectations, and the turnaround plan was failing so miserably,

that the Company would likely be forced to file for bankruptcy protection.  That day, Bloomberg

reported, in pertinent part, the following:

### *A&P Said to Consider Filing for Bankruptcy Protection*

Great Atlantic & Pacific Tea Co., the once-dominant grocery-store chain founded in 1859, may file for bankruptcy in the coming days to restructure debt, two people with knowledge of the matter said.

\*        \*        \*

A filing to reorganize under court protection may come as soon as this weekend, said the people, who declined to be identified because the matter is private.  A&P hired law firm Kirkland & Ellis LLP to represent it in negotiations with creditors and in any Chapter 11 proceeding, the people said.

\*        \*        \*

Hamstrung

A&P has lagged behind rivals on fresh food and presentation, said Jim Hertel, a managing partner at Willard Bishop Consulting, a Barrington, Illinois-based firm which advises retailers and suppliers.  A&P also has been hamstrung by a heavily unionized workforce, he said.

A&P's labor costs mean the company has less flexibility to invest in other parts of the store, Hertel said today in a telephone interview.

132.    The same day, Reuters reported, in pertinent part, the following:

People familiar with the company's vendors said *some vendors – including the companies that actually deliver the food to their stores – are now requiring cash on delivery, increasing the grocer's rate of cash burn*.  An attorney for one of the company's major vendors declined to comment.  A large vendor, C&S Wholesale Grocers, also declined to comment.

\*        \*        \*

Around mid-September, A&P's net debt was $1.48 billion – roughly eight times its market value.  The company's property was worth $1.37 billion at book, but it is burning through $55 million to $65 million of cash every quarter.

"When your creditors begin to get nervous about your credit situation, they request cash on delivery and refuse to extend you any credit," said Scott Peltz, a restructuring expert at McGladrey's Financial Advisory Services Group in Chicago.  "The liquidity crisis then becomes enhanced by the need to essentially fund their inventory with cash, seriously exacerbating the situation."

- 48 -

The company has sought help from advisors with more than $1 billion in debt maturing over the next two years, sources with direct knowledge of the situation said.

First up for the company is $165 million in convertible debt that comes due in June of 2011. Then the company has another convertible note of $255 million due as well as about $700 million in a variety of bank notes that mature.

Much of the debt dates to the company's 2007 purchase of Pathmark Stores. Bank of America and the now bankrupt Lehman Brothers provided a nearly $1.4 billion financing package at that time. ***Yucaipa had been a shareholder in Pathmark and received a stake in A&P at that time. It also has two board seats.***

133. Remarkably, the Reuters report also revealed that Yucaipa had increased its debt position in the months leading up to the anticipated bankruptcy of the Company, as a means of taking control of A&P. The Reuters report stated, in pertinent part, the following:

> ***[A&P's] biggest stockholders are activist investor Ron Burkle and the German retail group Tengelmann. Burkle's Yucaipa investment firm has built up a large position in the company's debt recently, putting it in a stronger position to take control of the company if it enters bankruptcy as part of the restructuring, people familiar with the firm's activities said***.

134. The news that A&P's turnaround plan had failed and that the Company would imminently file for bankruptcy – and the revelation that Yucaipa was purchasing A&P's debt so as to be in a strong position to take control of the Company when it filed for Chapter 11 – caused shares of A&P common stock to plummet 67% in a single trading day, falling from the previous day's closing price of $2.83 per share, to $0.93 per share on Friday December 10, 2010, on extremely heavy trading volume of over 19.98 million shares traded. The collapse in A&P's share price was so dramatic that trading in its common stock was halted during the afternoon of December 10, 2010.

135. On Sunday December 12, 2010, A&P issued a press release confirming that the Company had filed a petition for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code with the U.S. Bankruptcy Court for the Southern District of New York. According to the press release, "A&P's major shareholders support the action announced today and believe the Company's plan will advance and accelerate the comprehensive turnaround plan already underway."

The press release also stated that Defendant Brace, a member of the new management team installed by Burkle and Yucaipa, would lead the restructuring, serving as A&P's Chief Restructuring Officer – thereby ensuring that Yucaipa's interests were protected. The following day, the NYSE commenced proceedings to delist A&P's common stock.

### Additional Scienter Allegations

136.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding A&P, their control over, and/or receipt and/or modification of A&P's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning A&P, participated in the fraudulent scheme alleged herein.

137.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including each of the Defendants.

138.    As alleged above, Defendants improperly delayed recognizing a $321.8 million impairment charge to the value of Pathmark's goodwill, which Defendants knew or recklessly disregarded was impaired by the summer of 2009. Defendants were motivated to delay the goodwill impairment charge so that A&P could complete the 2015 Notes Offering on more favorable terms,

thereby raising $260 million in proceeds. Indeed, Yucaipa's $115 million investment in A&P (together with Tengelmann's $60 million investment) was conditioned upon the completion of the 2015 Notes Offering. Thus, delaying the goodwill impairment charge enabled A&P to raise $435 million at a time when the Company was in desperate need of capital.

139. Thereafter, Defendants highlighted A&P's "partnership" with Yucaipa and represented that Yucaipa was helping to turn the Company's fortunes around and create shareholder value. In truth, as each of the Defendants knew or recklessly disregarded, the "partnership" with Yucaipa was anything but a partnership, as Yucaipa was vying for control of A&P. Yucaipa's investment in A&P at the start of the Class Period, which gave Yucaipa two board seats and a 27.6% voting interest, was the first step in Burkle's plan to take over the Company – which he knew could not be turned around – so that he could steer A&P's eventual Chapter 11 reorganization into a private company run by him.

140. Indeed, Burkle and Yucaipa were uniquely positioned to know that the Pathmark business was in far worse condition than had been publicly disclosed because Yucaipa was the former majority shareholder of Pathmark prior to its acquisition by A&P in 2007.

141. Defendants also possessed knowledge of facts or had access to information contradicting their public statements that A&P was making progress in implementing its turnaround plan. In reality, A&P's operational and financial condition were continuing to deteriorate rapidly, and its turnaround efforts were constrained by the Company's high rate of cash burn and worsening liquidity crisis. For example, by the summer of 2010, A&P's vendors, including its primary supplier C&S, were requiring cash upon delivery, thereby increasing the Company's rate of cash burn and contributing to A&P's liquidity crisis. By June 2010, A&P was also failing to pay its lease obligations on "dark stores" and had been sued by a multitude of landlords as a result.

142.    By no later than October 2010, Yucaipa had begun to accrue a large stake in A&P's debt by purchasing the 11.375% Notes due 2015 – which Burkle had insisted that A&P offer as a condition to Yucaipa's investment in A&P at the start of the Class Period.  Burkle expected that the 11.375% Notes would receive high priority during a Chapter 11 reorganization, thereby positioning him to take control of A&P once it filed for Chapter 11.

143.    Yet, Defendants continued to falsely represent that A&P's turnaround efforts were progressing, that the Company's rate of cash burn was slowing, and that A&P would be able to procure additional financing to fund the turnaround.  In reality, A&P's very poor credit rating, combined with tight global credit markets, meant that there was no realistic possibility of securing the financing necessary to maintain A&P's liquidity, and indeed, Defendants knew that A&P's Chapter 11 filing was both imminent and unavoidable.

144.    As planned, Yucaipa's holdings in A&P enabled Burkle to take control of a restructured A&P, which is now poised to be more profitable after shedding the burdensome liabilities that contributed to its bankruptcy filing.

### Loss Causation/Economic Loss

145.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of A&P securities and operated as a fraud or deceit on Class Period purchasers of A&P securities by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of A&P securities fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of A&P securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses, *i.e.*, damages, under the federal securities laws.

146. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of A&P's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused A&P securities to trade at artificially inflated levels throughout the Class Period, with the Company's common stock reaching as high as $12.89 per share on January 8, 2010, before collapsing to $0.93 per share on December 10, 2010. The price of A&P preferred securities also traded at inflated levels and declined when the truth was revealed.

147. On January 12, 2010, A&P belatedly announced a $321.8 million charge attributable to an impairment of the entire amount of goodwill reported for its Pathmark business – which the Company should have recognized no later than the first fiscal quarter of 2009. In response to the announcement of the belated impairment charge, the price of A&P common stock plummeted nearly 21%, from a closing price of $12.88 per share on January 11, 2010, to close at $10.22 per share on January 12, 2010, on unusually heavy trading volume of more than 3 million shares traded. The price of A&P common stock declined an additional 15% over the next five trading days, as the market digested the import of A&P's massive goodwill impairment charge associated with its Pathmark business, closing at $8.66 per share on January 20, 2010.

148. Then, on December 10, 2010, investors discovered that A&P's turnaround plan had failed, and its financial condition and liquidity had deteriorated so severely, that the Company was expected to file for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code within the coming days. Media reports also revealed that A&P's purported "partner" Yucaipa had been purchasing large quantities of A&P's debt, so as to position itself to take control of A&P once it filed for Chapter 11.

149. In response to this news, shares of A&P common stock plummeted 67% in a single trading day, falling from the previous day's closing price of $2.83 per share, to $0.93 per share on

Friday December 10, 2010, on extremely heavy trading volume of over 19.98 million shares traded. The collapse in A&P's share price was so dramatic that trading in its common stock was halted during the afternoon of December 10, 2010. On Sunday December 12, 2010, A&P issued a press release confirming that the Company had filed a petition for bankruptcy protection under Chapter 11. The following day, the NYSE commenced proceedings to delist A&P's common stock.

150.    The precipitous decline in the price of A&P securities was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of A&P securities negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of A&P securities and the subsequent significant decline in the value of A&P securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

151.    The dramatic declines in the prices of A&P common stock and A&P preferred securities are illustrated by the following charts:



NYSE: GAP / Common Stock



NYSE: GAJ / Preferred Stock

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

152.    At all relevant times, the market for A&P's securities was an efficient market for the following reasons, among others:

(a)    A&P stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    as a regulated issuer, A&P filed periodic public reports with the SEC and the NYSE;

(c)    A&P regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    A&P was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

153.    As a result of the foregoing, the market for A&P securities promptly digested current information regarding A&P from all publicly available sources and reflected such information in A&P stock prices.  Under these circumstances, all purchasers of A&P securities during the Class Period suffered similar injury through their purchase of A&P securities at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

154.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of A&P who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

158.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for A&P securities.  Plaintiffs and the Class would not have purchased A&P securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

159.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of A&P securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

160.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161.    Defendants acted as controlling persons of A&P within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of A&P, and/or their ownership of A&P securities, Defendants had the power and authority to cause

A&P to engage in the wrongful conduct complained of herein. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives and designating Lead Counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  March 16, 2012                       COHN LIFLAND PEARLMAN
                                               HERRMANN & KNOPF LLP
                                             PETER S. PEARLMAN


                                             _____
                                                   */s/ Peter S. Pearlman*
                                             PETER S. PEARLMAN

                                             Park 80 West-Plaza One
                                             250 Pehle Ave., Suite 401
                                             Saddle Brook, NJ  07663
                                             Telephone:  201/845-9600
                                             201/845-9423 (fax)

                                             *Liaison Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

KAHN SWICK & FOTI, LLC
MICHAEL A. SWICK
500 5th Avenue, Suite 1810
New York, NY  10110
Telephone:  212/696-3730
504/455-1498 (fax)

*Additional Counsel for Plaintiffs*