# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RICKY DUDLEY,** *individually and on behalf of all others similarly situated*, | Civ. No. 2:11-cv-05196 (WJM) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **CHRISTIAN W.E. HAUB,** *et al.*, | |
| **Defendants.** | |

## WILLIAM J.  MARTINI, U.S.D.J.:

This is a federal securities class action brought by Lead Plaintiffs City of New Haven Employees' Retirement System and Plumbers and Pipefitters Locals 502 & 633 Pension Trust Fund ("Plaintiffs") on behalf of purchasers of the securities of The Great Atlantic & Pacific Tea Company ("A&P" or the "Company") between July 23, 2009 and December 10, 2010 (the "Class Period").  On March 16, 2012, Plaintiffs filed an Amended Complaint against Christian W. E. Haub ("Haub"), Eric Claus ("Claus"), Brenda M. Galgano ("Galgano"), Ronald Marshall ("Marshall"), Samuel Martin ("Martin"), and Frederic Brace ("Brace") (the "A&P Defendants"); and The Yucaipa Companies LLC ("Yucaipa") and Ronald Burkle ("Burkle") (the "Yucaipa Defendants").[1]  Collectively, the A&P Defendants and the Yucaipa Defendants are referred to as "Defendants."  The Amended Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

This matter comes before the Court on motions to dismiss filed by the A&P Defendants and the Yucaipa Defendants.  There was no oral argument.  Fed. R. Civ. P. 78(b).  For the reasons set forth below, the A&P Defendants' motion to dismiss is **GRANTED** in part, and **DENIED** in part; and the Yucaipa Defendants' motion to dismiss is **GRANTED**.

---

[1] As explained in detail below, A&P filed for protection under Chapter 11 of the United States Bankruptcy Code and for that reason is not named as a defendant in this action.

## I.    BACKGROUND

A&P was founded in 1859 and was one of the nation's first supermarket chains. Am. Compl. ¶ 37, ECF No. 25.  As of July 23, 2009, A&P operated 435 stores in the Northeast and Mid-Atlantic under various trade names, including A&P, Waldbaum's, and The Food Emporium.  *Id.*  The Company maintains its chief executive offices and principal place of business in Montvale, New Jersey. *Id.* ¶ 17.  A&P's common stock was publicly traded on the New York Stock Exchange ("NYSE").  *Id.*

The A&P Defendants are current or former officers and directors of A&P.  During the Class Period, A&P had four Chief Executive Officers ("CEOs").  Defendant Claus was CEO between July 23, 2009 and October 19, 2009.  Am. Compl. ¶ 19.  Defendant Haub was CEO from October 20, 2009 to February 8, 2010.  *Id.* ¶ 18.  Defendant Marshall was CEO from February 8, 2010 to July 23, 2010.  *Id.* ¶¶ 23-24.  And Defendant Martin was CEO from July 23, 2010 through December 10, 2010.  *Id.* ¶ 24.  Defendant Galgano was the Chief Financial Officer ("CFO") of A&P during the entire Class Period.  *Id.* ¶ 20.  Defendant Brace was appointed to A&P's board of directors on August 4, 2009.  *Id.* ¶ 25.  Brace became the Chief Administrative Officer of A&P on August 20, 2010.  *Id.*

Defendant Yucaipa is a Los Angeles-based private equity firm.  Am. Compl. ¶ 21. Defendant Burkle is the founder and Chairman of Yucaipa.  *Id.* ¶ 22.

### A.  The Goodwill Impairment Charge

In 2007, A&P acquired Pathmark Stores, Inc. ("Pathmark"), a discount supermarket chain in which Defendant Yucaipa had been the majority shareholder.  Am. Compl. ¶¶ 2, 39.  Thereafter, A&P struggled to integrate the Pathmark acquisition.  *Id.* ¶¶ 3, 39.  Pathmark represented a significant percentage of A&P's total business.  *Id.* ¶ 63

In the spring of 2009, A&P was facing decreased sales and declining profitability throughout its business, in addition to an ever-worsening liquidity crisis, making the Company desperate for capital.  Am. Compl. ¶¶ 39, 65, 67.  Pathmark was also struggling.  Am. Compl. ¶¶ 39, 47-48.  After the acquisition, A&P discovered that Pathmark had numerous hidden liabilities.  *Id.* ¶ 47.  For example, many Pathmark stores were plagued by massive amounts of stock loss (*i.e.*, theft), including organized crime within the stores.  *Id.*  Following the Pathmark acquisition, A&P's total stock loss ballooned to between $150 million and $160 million per year, most of which was attributable to Pathmark.  *Id.*  In addition, A&P discovered hundreds of millions of dollars worth of pension and vacation liabilities held by Pathmark, which A&P had not discovered during the due diligence process.  *Id.* at 48.

On July 23, 2009 (the start of the Class Period), the A&P Defendants announced that Yucaipa had agreed to invest $115 million in the Company in the form of newly-

issued preferred shares, together with an additional $60 million investment by Tengelmann Warenhandelsgesellschaft KG ("Tengelmann"), A&P's existing majority shareholder. Am. Compl. ¶¶ 3, 40, 86. In return, Yucaipa would receive a 27.6% ownership interest in A&P and would be entitled to appoint two members of A&P's board of directors. *Id.* The new investment by Yucaipa and the additional investment by Tengelmann were conditioned upon a private placement of second lien senior secured notes due 2015 (the "2015 Notes Offering"). *Id.* ¶¶ 3, 40, 86, 90. On July 23, 2009, following A&P's announcement of the Yupaica and Tengelmann investments and the 2015 Notes Offering, the price of A&P common stock rose nearly 15% on heavy trading volume, to close at closing at $5.33 per share compared to the prior day's close of $4.65 per share. *Id.* ¶ 91. Plaintiffs allege that, unbeknownst to investors, A&P was able to conduct the 2015 Notes Offering on more favorable terms because Defendants materially overstated A&P's income and assets. Am. Compl. ¶ 4.

Generally Accepted Accounting Principles ("GAAP") are the guidelines and rules for financial accounting used by the accounting profession in the United States. Compliance with GAAP is a basic obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). The SEC has designated the Financial Accounting Standards Board ("FASB") as the organization responsible for setting accounting standards for public companies in the United States. In order to establish accounting principles, the FASB issues pronouncements that address general or specific accounting issues. These pronouncements include Statements of Financial Accounting Standards ("SFAS").

When a business is first acquired, the fair market value of the business is calculated by taking the total assets of the business and subtracting all of the liabilities. In addition to looking at how much a business' assets are worth, an acquirer looks at how much money a business is expected to make over time. An acquirer will purchase a business for more than its fair market value because the purchase price will take into account the amount of money that the business is expected to make in the future. The difference between the fair market value and the purchase price is called "goodwill." *See* SFAS No. 141 ¶¶ 101-14. The value of a business' goodwill can decline after the acquisition if, for example, the business does not make as much money as expected.

During the Class Period, companies were required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. SFAS No. 142 requires that a company review its goodwill on a regular basis to determine if its reported value is impaired (*i.e.*, if its value has declined). The value of goodwill is impaired when the reported amount of goodwill exceeds its fair value. GAAP requires companies to conduct annual tests to determine if the reported value of goodwill is impaired. *See* SFAS No. 142 ¶¶ 18-29. SFAS No. 142 provides that "[g]oodwill of a reporting unit

3

shall be tested for impairment between annual tests *if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its [reported] amount.*" SFAS No. 142 ¶ 28 (emphasis added). "Examples of such events or circumstances include" a "significant adverse change in legal factors or in the business climate," and "[u]nanticipated competition." *Id.* A&P's internal accounting standards tracked the GAAP standards. A&P's 2008 Annual Report stated that goodwill would be tested "whenever events or changes in circumstances indicate[d] that impairment may have occurred." Am. Compl. ¶ 55. The Annual Report stated that "[p]ossible indicators of impairment" included "sustained operating losses or poor operating performance trends, a significant decline in our expected future cash flows for a reporting unit, [and] a decrease in our market capitalization below our book value for a sustained period of time." *Id.*

Plaintiffs allege that, by the summer of 2009, there were numerous indicators that the Pathmark business' goodwill was impaired. Am. Compl. ¶ 57. A&P's Pathmark business was in steep decline by the first fiscal quarter of 2009 (which ended on June 20, 2009). *Id.* ¶¶ 55, 57. In addition, the market valued A&P's entire business at between $215 million and $490 million during the summer of 2009, while the Company's cash balance averaged approximately $234 million. *Id.* at 62. After subtracting A&P's cash from the market's valuation of A&P's entire business, A&P's net assets were valued at between zero and $256 million. *Id.* ¶¶ 62-63. Pathmark represented less than half of A&P's total business, but its reported goodwill during this time period was $321.8 million. *Id.* ¶ 63. Plaintiffs allege that, despite these indicators of impairment, no impairment was taken. As a result, A&P's Form 10-Q, which disclosed the Company's financial results for the first fiscal quarter of 2009, overstated A&P's income and assets. *Id.* ¶ 89. Defendants Claus and Galgano signed A&P's first quarter Form 10-Q. *Id.*

On August 4, 2009, the A&P Defendants announced the completion of the 2015 Notes Offering, which raised $260 million in proceeds. *Id.* ¶¶ 3, 40, 93. The 2015 Notes Offering, together with the Yucaipa and Tengelmann investments, represented a total of $435 million of additional capital that was critical to the Company's continued operations. Am. Compl. ¶ 67.

A&P's second fiscal quarter ended on September 12, 2009. Am. Compl. ¶ 59. During an A&P earnings conference call held on October 20, 2009 announcing the second quarter financial results, Defendant Haub acknowledged that the business climate had changed significantly due to the economic recession, stating:

> When it comes to describing the overall environment we are operating in, I can certainly say that the external headwinds ha[ve] really become worse during the second quarter and the first part of our third quarter. Unemployment keeps rising. Consumers continue to trade down. Price competition is heating up in our markets and now we are also experiencing significant deflation

> across our entire business.  It is fair to say that we are currently
> going through one of the wors[t] environments I have ever
> experienced in my career in the supermarket industry.

*Id.*  Haub further stated that the Company had been forced to implement massive price cuts at Pathmark in response to intense price competition.  Am. Compl. ¶ 60.  These draconian price cuts, coupled with a major advertising campaign, caused A&P's Pathmark business to experience unprecedented operating losses during the second fiscal quarter of 2009.  *Id.*

Plaintiffs allege that, despite numerous indicators of goodwill impairment, the A&P Defendants still failed to write down the value of the Pathmark business' goodwill.  Am. Compl. ¶ 59.  Instead, A&P's second quarter Form 10-Q represented that notwithstanding: (i) the severity and duration of operating losses; (ii) reduced internal revenue and profitability forecasts; and (iii) revised cash flow projections associated with the Pathmark business, the Pathmark business could withstand a "decrease in fair value of over 25%" before a goodwill impairment charge would be necessary.  *Id.* ¶¶ 61, 64, 99.  Defendants Haub and Galgano signed A&P's second quarter Form 10-Q.  *Id.* ¶ 99.

On January 12, 2010, the A&P Defendants recognized a $321.8 million impairment charge, representing an impairment of the entire amount of reported goodwill for the Pathmark business.  Am. Compl. ¶¶ 4, 58, 105-06, 147.  Following the announcement of the impairment charge, the price of A&P common stock plummeted nearly 21%, from a closing price of $12.88 per share on January 11, 2010, to a closing price of $10.22 per share on January 12, 2010, on unusually heavy trading volume of more than 3 million shares traded.  *Id.* ¶ 106.  The price of A&P common stock declined an additional 15% over the next five trading days, closing at $8.66 per share on January 20, 2010.  *Id.*

### B.  The Company's Turnaround Efforts

Plaintiffs allege that, throughout the Class Period, the A&P Defendants falsely stated that A&P was making progress in implementing its turnaround initiatives.  *See, e.g.*, Am. Compl. ¶¶ 97-98, 102, 104, 110, 114-17, 120, 124-27.  Plaintiffs included a litany of public statements regarding the turnaround initiatives in the Amended Complaint.  For example, the Amended Complaint alleges that A&P made statements that the Company was going to "focus on building sustainable profitability in the longer-term," (Am. Compl. ¶ 87); that the Company's "strategies will position [it] to realize the tremendous strategic value of the company," (*id.* ¶ 97); that, "once the economy improves these strategies will position [A&P] well to realize the tremendous strategic value of the company" (*id.*); that A&P would "focus on improving its operations[,] realizing the benefits of its many opportunities and driving its format strategy," (*id.* ¶ 98); that the Company "will successfully manage through the current major recession and emerge as a much stronger player in the Northeast supermarket industry" (*id.* ¶ 104); that various

executives remained "confident" about A&P's future and "look[ed] forward to realizing the full potential of the Company" (*id.*); that "fixes in [the] company are attainable and the initiatives are in place today to provide us the path forward" (*id.* ¶ 110); and that the Company would "continue to make significant incremental progress in executing [the] turnaround plan for the benefit of all [its] stakeholders" (*id.* ¶ 125).

Plaintiffs allege that the truth was much less rosy than these statements suggested. The reality was that A&P's operational and financial conditions were continuing to rapidly deteriorate, and the Company's turnaround efforts were constrained by its high rate of cash burn and worsening liquidity crisis.  Am. Compl. ¶¶ 6, 66, 119, 130. According to a confidential witness ("CW1"),[2] A&P was struggling with an extremely high rate of cash burn, and as a consequence, the $435 million in capital raised at the start of the Class Period only provided a temporary reprieve.  *Id.* ¶ 67.

During the Class Period, A&P's suppliers and other vendors began requiring A&P to pay in cash upon delivery due to concerns about the Company's creditworthiness.  *Id.* ¶¶ 6, 70, 132.  By the summer of 2010, A&P's primary inventory supplier, C&S Wholesale Grocers ("C&S"), was requiring cash upon delivery.  *Id.* ¶ 70.  On a July 23, 2010 conference call with analysts, Defendant Haub was asked if A&P's vendors were nervous about A&P's creditworthiness.  *Id.* ¶ 118.  In response, Haub stated:

> We have regular dialogue with all of our vendors, and that hasn't changed, and we don't foresee any of that changing. They are focused on how they can play a role in the turnaround of the business and how they can build their business, and we communicate to them what we are working on and the progress we are making in the business. And so this has been a very collaborative and supportive ongoing relationship.

*Id.*

In addition, A&P's cash flow was so constrained during the Class Period that, unbeknownst to investors, the Company had stopped making lease payments on many of its "dark stores," *i.e.*, properties where A&P had ceased operating but was still liable for lease payments under long-term leases.  *Id.* ¶ 68.  In June 2010, A&P informed landlords at 66 dark stores located in the Midwest that it was halting lease payments, prompting lawsuits against A&P by nearly all of the landlords.  *Id.* ¶¶ 6, 69.  Plaintiffs allege that, on an October 22, 2010 conference call with analysts, an analyst explicitly asked about the Company's dark store leases.  In response, Defendant Brace stated:

> [W]e have an ongoing program to minimize our dark store payments. . . .  Some of it, quite frankly, can be lumpy as we come

---

[2] According to the Amended Complaint, CW1 is a former senior management-level employee who worked at A&P's corporate headquarters through the spring of 2010, who reported directly to the Company's CEO, and who regularly attended board meetings.  Am. Compl. ¶ 43.

> to certain arrangements with our landlords and things like that.  But
> we are focused solely on the cash flow related to that and trying to,
> obviously, minimize any negative cash flow related to dark stores.

*Id.* ¶ 128.

At the same time, the A&P Defendants were representing that A&P's turnaround efforts were progressing, that the Company's rate of cash burn was slowing, and that A&P would be able to procure additional financing to fund the turnaround.  *Id.* ¶¶ 8, 71, 124-28.  For example, the Company issued statements saying that it "ha[d] made progress in several of [its] formats and many of [its] initiatives," (Am. Compl. ¶ 97); that the Company was "already experiencing some of the improvements" from the turnaround plan (*id.* ¶ 104); and that the Company was "gaining ground in . . . making prudent reinvestments in [its] business and reducing costs through a process of continuous improvement" (*id.* ¶ 110).  Plaintiffs argue that, in truth, Defendants knew that A&P's very poor credit rating, combined with tight global credit markets, meant that there was no realistic possibility of securing the financing necessary to maintain A&P's liquidity, and A&P's Chapter 11 filing was both imminent and unavoidable.  *Id.* ¶¶ 8, 71, 130.

Although the Amended Complaint quotes positive statements made by the Company, the disclosures filed by the Company also identified various risks, including: (1) the possible adverse effects of changes in customer shopping habits, interest rates, energy costs, and unemployment rates (Declaration of Sheila A. Sadighi ("Sadighi Decl.") Ex. 2 at 48-50, ECF No. 49-5); (2) cash flow and "supplier quality control problems" that could affect customer satisfaction and operations (Sadighi Decl. Ex. 10 at 1); (3) a suffering supermarket industry (Sadighi Decl. Ex. 12A at 1); (4) pressures in capital markets and potential inability "to obtain . . . financing or sell assets on satisfactory terms, or at all" (Sadighi Decl. Ex. 10 at 1); (5) the possibility that "failure to execute on our turnaround plan could adversely affect [the Company's] liquidity, financial condition and results" (Sadighi Decl. Ex. 12A at 7-8); and (vi) the possibility that, if the Company did not complete the turnaround, "there [was] substantial doubt about [the] Company's ability to continue as a going concern" (Sadighi Decl. Ex. 22 at 42-43).

## C.  A&P's Relationship with Yucaipa

Plaintiffs' allege that, throughout the Class Period, the A&P Defendants made numerous public statements highlighting A&P's new partnership with Yucaipa and representing that Yucaipa was helping to turn the Company's fortunes around and create shareholder value.  *See, e.g.*, Am. Compl. ¶ 87 (describing "strategic partnership" with Yucaipa and stating that "[t]he addition of Yucaipa as a significant investment partner provides the necessary resources to successfully execute our strategies and . . . focus on building sustainable profitability in the longer-term"); *Id.* ¶ 97 ("our working relationship with Yucaipa is off to a great start as we continue to look at ways to improve our overall

business strategy"); *Id.* ¶ 98 ("with the support of Yucaipa, [A&P] will successfully manage through the current major recession and emerge a much stronger player in the northeast supermarket industry"); *Id.* ¶ 102 ("we have been fully engaged with Yucaipa and have leveraged their significant skills and industry expertise"); *Id.* ¶ 104 (we "remain confident about A&P's future and look forward to realizing the full potential of the Company and working together with Yucaipa to achieve significant shareholder value in the next several years"); *Id.*  ¶ 114 ("Yucaipa [had] been instrumental in developing . . . the right turnaround strategy for A&P"); *Id.* ¶ 116 ("Yucaipa "remain[ed] actively involved in our efforts to improve the [C]ompany's performance," and "continued [to] belie[ve] in the long-term value of their investment in A&P").

But, Plaintiffs allege, the partnership with Yucaipa was anything but a partnership, as Yucaipa was vying for control of A&P.  Am. Compl. ¶¶ 5, 41, 95, 107, 119.  Yucaipa's investment in A&P at the start of the Class Period, which gave it a substantial voting interest and two board seats, was actually the first step in Defendant Burkle's plan to take over the Company – which he knew could not be turned around – so that he could steer A&P's eventual reorganization under Chapter 11 into a private company run by him.  *Id.* ¶¶ 5, 42, 95, 107, 119.

According to CW1, Burkle quickly installed his own management team at A&P.  Am. Compl. ¶ 43.  CW1 stated that Burkle appointed Defendant Brace to the board of directors on August 4, 2009 because of his bankruptcy expertise, with the intention that Brace would manage A&P's eventual Chapter 11 reorganization, and steer the process in Burkle's favor.  *Id.* ¶ 43.  Plaintiffs allege that Yucaipa was responsible for ousting Defendant Claus from his position as CEO, and for bringing in Defendant Martin to serve as CEO following Defendant Marshall's departure.  *Id.* ¶ 45.  Plaintiffs allege that, although Yucaipa was entitled to appoint two board members, additional Yucaipa personnel attended A&P board meetings during the Class Period, such that approximately 40% of the attendees represented Yucaipa's interests.  *Id.* ¶ 44.  Finally, Plaintiffs allege that, by October 2010, Yucaipa had begun to accrue a large stake in A&P's debt by buying up the notes from the 2015 Notes Offering.  Am. Compl. ¶¶ 7, 72-75.

## D.  A&P Declares Bankruptcy

On December 10, 2010, the last day of the Class Period, investors learned that A&P's turnaround plan had failed, and its financial condition and liquidity had deteriorated so severely that the Company was expected to file for bankruptcy protection under Chapter 11 within days.  Am. Compl. ¶¶ 9, 73, 131-32, 148.  Media reports also revealed that Yucaipa had been purchasing large quantities of A&P's debt.  *Id.* ¶¶ 9, 73-75, 133, 148.  In response to the news, shares of A&P common stock plummeted 67% in a single trading day, falling from the previous day's closing price of $2.83 per share, to $0.93 per share on Friday December 10, 2010, on extremely heavy trading volume.  *Id.* ¶¶ 10, 134, 149.  On Sunday December 12, 2010, A&P issued a press release confirming that the Company had filed a petition for bankruptcy protection under Chapter 11.  Am.

Compl. ¶¶ 10, 135, 149.  The press release stated that Defendant Brace would serve as A&P's Chief Restructuring Officer.  *Id.* ¶ 135.  The following day, the New York Stock Exchange commenced proceedings to delist A&P's common stock.  *Id.* ¶¶ 135, 149.

During the bankruptcy, all shareholders of A&P common stock, including Tengelmann, Yucaipa, and all of the A&P Defendants who held stock, had their equity interests in A&P wiped out.  *See* Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the U.S. Bankr. Code, *In re A&P*, No. 10-24549 (RDD) at 31 (Bankr. S.D.N.Y. Feb. 28, 2012).  In November 2011, Yucaipa and two other investors agreed to provide a $490 million capital investment to fund A&P's reorganization plan, which the bankruptcy court approved on December 6, 2011.  Am. Compl. ¶ 79.  The bankruptcy court confirmed A&P's plan on February 28, 2012, and A&P emerged from bankruptcy on March 13, 2012 with approximately one-third of its pre-petition debt.  Am. Compl. ¶¶ 77-78.  Yucaipa emerged from the bankruptcy with a minority interest in the newly privatized A&P, and Burkle became chairman of the board of directors.  Am. Compl. ¶¶ 83, 85; *see also* Order Authorizing the Debtors to (A) Enter Into Certain Sec. Purchase Agreements For a $490 Million New Capital Investment and (B) Pay Certain Fees in Connection Therewith, Each to Support Debtors' Plan of Reorganization, *In re A&P*, No. 10-24549 (RDD) at 1 (Bankr. S.D.N.Y. Dec. 6, 2011).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted.  The moving party bears the burden of showing that no claim has been stated.  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face."  *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).  While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility."  *Iqbal*, 129 S.Ct. at 1949 (2009).

Securities fraud actions are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4, et seq., and Federal Rule of Civil Procedure 9(b), which require that allegations of fraud be stated with particularity.  Under PSLRA, when a plaintiff's claim is based on alleged misrepresentations or omissions of a material fact, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

## III.   DISCUSSION

Plaintiffs' Amended Complaint asserts two causes of action: (1) Count 1: violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (2) Count 2: violation of Section 20(a) of the Exchange Act.  The A&P Defendants and the Yucaipa Defendants move to dismiss both counts.  The Court will address:  (1) the Section 10(b) claim against the A&P Defendants; (2) the Section 20(a) claim against the A&P Defendants; and then (3) the Section 10(b) and Section 20(a) claims against the Yucaipa Defendants.

### A.  The Section 10(b) Claim Against the A&P Defendants

In Count 1, Plaintiffs assert a claim against the A&P Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, which was promulgated under Section 10(b), makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a valid claim under Rule 10b-5(b), a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (internal quotations omitted).  In this case, the A&P Defendants challenge the first factor (whether there was a material misrepresentation or omission), the second factor (scienter), and the sixth factor (loss causation).  The Court will address each factor in turn.

### i.  Whether There Was a Material Misrepresentation or Omission By the A&P Defendants

"To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was 'misleading as to a material fact.'"  *Matrixx*, 131 S. Ct. at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  This requirement is satisfied

when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*, 485 U.S. at 231-32 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The representations included in the Amended Complaint fall into three categories: (1) representations regarding the goodwill impairment charge ("Goodwill Impairment Charge"); (2) representations regarding the Company's turnaround initiatives ("Turnaround Plan"); and (3) representations regarding A&P's relationship with Yucaipa ("Relationship with Yucaipa"). The Court will discuss each in turn.

### 1. Goodwill Impairment Charge

Plaintiffs allege that the A&P Defendants made material misrepresentations in connection with the goodwill impairment charge taken for the Pathmark business. A&P announced the Goodwill Impairment Charge on January 12, 2010. Plaintiffs allege that A&P should have taken the impairment charge between March 1, 2009 and September 12, 2009, *i.e.*, during the first and second quarters of fiscal year 2009 (the "summer of 2009"). Plaintiffs allege that, during the summer of 2009: (1) A&P's income and assets were materially overstated; (2) A&P's disclosures falsely represented that their financial results were presented in conformity with GAAP; and (3) A&P falsely stated that the Pathmark business could withstand a "decrease in fair value of over 25%" before an impairment charge would be necessary. Am. Compl. ¶¶ 61, 64, 99. The Form 10-Q disclosures reporting A&P's financial results for the first and second quarters of fiscal year 2009 were signed by Claus, Galgano, and Haub. The Court finds that Plaintiffs have plausibly alleged that Claus, Galgano, and Haub made material misrepresentations in connection with the Goodwill Impairment Charge.

GAAP required that the "[g]oodwill of a reporting unit . . . be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its [reported] amount." SFAS No. 142 ¶ 28. "Examples of such events or circumstances include[d]" a "significant adverse change in legal factors or in the business climate" and "[u]nanticipated competition." *Id.* A&P's internal accounting standards tracked the GAAP standards. A&P's disclosures stated that goodwill would be tested "whenever events or changes in circumstances indicate[d] that impairment may have occurred." Am. Compl. ¶ 55. Those disclosures stated that "[p]ossible indicators of impairment" included "sustained operating losses or poor operating performance trends, a significant decline in our expected future cash flows for a reporting unit, [and] a decrease in our market capitalization below our book value for a sustained period of time." *Id.* Virtually all of these "[p]ossible indicators of impairment" were present in the summer of 2009.

<u>First</u>, the Pathmark business experienced enormous, "sustained operating losses" both before and during the Class Period. *See* Am. Compl. ¶ 60 (reporting quarterly losses of $2.45 million in the second quarter of fiscal year 2008; losses of $1.9 million in the third quarter of fiscal year 2008; losses of $1.78 million in the first quarter of fiscal year

2009; and losses of more than $15 million in the second quarter of fiscal year 2009). Indeed, in its Form 10-Q for the second quarter of fiscal year 2009, the Company stated that it had to reduce its profitability forecasts for Pathmark "[d]ue to the severity and duration of operating losses." *Id.* ¶ 61. In addition, the Company acknowledged that there was a significant decline in expected future cash flows for the Pathmark business.

Second, the Company experienced "a decrease in [its] market capitalization below our book value for a sustained period of time." Am. Compl. ¶ 55. During the summer of 2009, Pathmark's reported goodwill vastly exceeded the market's valuation of the ***entire Company***. Am. Compl. ¶¶ 62-63. The entire A&P enterprise was valued at somewhere between zero and $256 million. *Id.* ¶ 62. Pathmark represented less than half of A&P's business, but A&P reported Pathmark's goodwill as more than $321.8 million. *Id.* ¶ 63. Defendants argue that market capitalization can continuously change, and that A&P should not be required to record an impairment every time there is a temporary dip in the Company's stock price. However, the allegations in the Amended Complaint make clear that the decline in A&P's market capitalization was not a momentary blip, but a sustained decline. *See* Am. Compl. ¶¶ 60-61.

Third, there was "a significant adverse change . . . in the business climate" due to the economic recession. During an A&P earnings call held on October 20, 2009, Defendant Haub stated that A&P was operating in "one of the wors[t] environments I have ever experienced in my career in the supermarket industry." Am. Compl. ¶ 59. Haub identified numerous factors contributing to the adverse change in the business climate, including rising unemployment and "significant deflation." *Id.*

Fourth, there was "unanticipated [price] competition" as a result of the recession. Haub 10/20/09 earnings call, Am. Compl. ¶ 59 ("Price competition is heating up in our markets"). In order to compete for consumers in the new economic climate, the Company was forced to make draconian price cuts, causing the Pathmark business to lose an unprecedented amount of money. *Id.* ¶¶ 59-60.

Finally, the magnitude of the impairment suggests that it should have been recorded earlier. Goodwill does not go from being unimpaired to fully impaired overnight. But in this case, the Company did not record any impairment for ten months and then wrote down the entire amount of reported goodwill in a single day. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2003) (where no impairment was taken the previous quarter, magnitude of a sudden goodwill impairment "support[ed] a reasonable belief that . . . impairments of goodwill should have been reported, but were not.").

These allegations, taken as a whole, plausibly demonstrate that Claus, Galgano, and Haub knew that it was more likely than not that the goodwill of the Pathmark business was overvalued in the relevant quarters. Courts faced with similar facts have come to the same conclusion. *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 269 (S.D.N.Y. 2009) ("if . . . based

on allegations that a defendant disregarded [a] clear and unmistakable loss, the failure to take impairment charges may provide a viable basis for a securities fraud claim"); *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02-4483, 2005 WL 735937, at *14 (S.D.N.Y. Mar. 30, 2005) (securities fraud claim upheld where internet investments experienced steep declines in revenue and share price, yet company failed to take a write-down); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 465-66 (S.D.N.Y. 2005) (plaintiff adequately alleged that an "impairment charge . . . should have been taken sooner than it was" where, *inter alia*, management acknowledged that the telecommunications market had "imploded" and confidential sources indicated that asset values were vastly overstated).

Defendants' arguments to the contrary are unpersuasive.  Defendants argue that Plaintiffs are improperly attempting to plead fraud by hindsight.  The Court disagrees.  The Amended Complaint describes contemporaneous circumstances in each relevant quarter showing that Pathmark's goodwill was impaired.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491, 494 (S.D.N.Y. 2004) (allegation that company failed to timely recognize an impairment of the value of its planes was not fraud by hindsight because plaintiffs alleged contemporaneous impairment indicators including poor market conditions, loss of customers and lack of demand); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("This is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited contemporaneous circumstances . . . of which [the defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to [fraud]").

Defendants further argue that A&P's failure to take the goodwill impairment could not have been fraudulent because all of the underlying financial data was disclosed to investors.  But if that were true, then companies would never have to record an impairment as long as they disclosed their financial statements.  The fact that A&P met its other disclosure obligations does not absolve it of its obligation to comply with GAAP.  *See Omnicom Grp.*, 2005 U.S. Dist. LEXIS 5272, at *20-*21 (rejecting argument that information relevant to goodwill impairment charge was sufficiently disclosed to the market).  And the fact that A&P issued warnings that an impairment charge might be taken in the future did not relieve the Company from recording the impairment at the appropriate time.  *See Bauer v. Prudential Fin., Inc.*, 2010 U.S. Dist. LEXIS 64384, at *38 (D.N.J. June 29, 2010) ("warnings do not insulate Defendants from allegations that assets were already impaired, which Plaintiff clearly alleges").

Accordingly, the Court finds that Plaintiffs have plausibly alleged that Defendants Claus, Galgano, and Haub made material misrepresentations in connection with the Goodwill Impairment Charge.

## 2.  Turnaround Plan

Plaintiffs allege that the A&P Defendants made material misrepresentations and omissions in connection with the Company's July 2010 turnaround plan.  Specifically, Plaintiffs allege that Defendants did not disclose that "the Pathmark acquisition was a complete disaster," Am. Compl. ¶¶ 95(c), 107(c), 119(c), 130(c); that Defendants "lacked a reasonable basis for their positive statements about the Company," *id.* ¶¶ 95(e), 107(d), 119(g), 130(h); and that "A&P's turnaround efforts were not meeting with success." *Id.* ¶ 130(d).  Defendants argue that the statements identified in the Amended Complaint are either inactionable forward-looking statements or inactionable statements of corporate optimism.  The Court finds that two of the statements identified in the Amended Complaint are actionable, but the others are not.

Under the PSLRA, alleged misrepresentations are not actionable if they fall within the safe harbor for forward-looking statements.  15 U.S.C. § 78u–5(c).  The PSLRA defines "forward-looking statements" to include statements containing projections of future performance, statements of the plans and objectives of management for future operations, and assumptions underlying statements about future financial, economic or operational performance.  15 U.S.C. § 78u–5(i)(1).  The safe harbor applies to forward-looking statements, provided that the statements are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u–5(c)(1)–(2).

Alleged misrepresentations are also not actionable if they are vague expressions of corporate optimism.  The Third Circuit has explained that "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism . . . constitute no more than 'puffery' and are understood by reasonable investors as such." *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)).  Because these statements are "too vague to be actionable," they are not considered material for purposes of Rule 10b-5.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 (3d Cir. 1997).  "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Id.* at 1426.

In this case, the vast majority of the alleged misrepresentations and omissions related to the Company's turnaround plan are inactionable.  Many of these alleged misrepresentations are classic forward-looking statements.  Statements that the Company would "continue to make significant incremental progress in executing [the] turnaround plan for the benefit of all [its] stakeholders" (Am. Compl. ¶ 125), that the Company's "strategies will position [it] to realize the tremendous strategic value of the company," (*id.* ¶ 97), and that the Company "will successfully manage through the current major recession and emerge as a much stronger player in the Northeast supermarket industry,"

are vague projections of future performance.  *Id.* ¶ 104.  Statements that the Company was going to "focus on building sustainable profitability in the longer-term," (*id.* ¶ 87), and that it would "focus on improving its operations[,] realizing the benefits of its many opportunities and driving its format strategy," (*id.* ¶ 98) merely convey the objectives of management.

These forward-looking statements were accompanied by meaningful cautionary language, identifying specific risk factors, including:  (1) the possible adverse effects of changes in customer shopping habits, interest rates, energy costs, and unemployment rates; (2) cash flow and "supplier quality control problems" that could affect customer satisfaction and operations (Sadighi Decl. Ex. 10 at 1); (3) a suffering supermarket industry; (4) pressures in capital markets and potential inability "to obtain . . . financing or sell assets on satisfactory terms, or at all" (*id.*); (5) the possibility that "failure to execute on our turnaround plan could adversely affect [the Company's] liquidity, financial condition and results" (Sadighi Decl. Ex. 12A at 7-8); and (vi) the possibility that, if the Company did not complete the turnaround, "there [was] substantial doubt about [the] Company's ability to continue as a going concern" (Sadighi Decl. Ex. 22 at 42-43).  Accordingly, these statements fall within the PSLRA safe harbor and are not actionable.

The bulk of the remaining statements are expressions of corporate optimism that are too vague to be actionable.  The Amended Complaint is rife with hopeful statements such as: "once the economy improves these strategies will position us well to realize the tremendous strategic value of the company" (Am. Compl. ¶ 97); "fixes in our company are attainable and the initiatives are in place today to provide us the path forward" (*id.* ¶ 110); and that various executives remained "confident" about A&P's future and "look[ed] forward to realizing the full potential of the Company" (*id.* ¶ 104).  Such generic expressions of optimism constitute puffery.  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 405-06 (D.N.J. 2010) (holding that statement that "Synchronoss is well positioned to benefit from multiple growth opportunities" was inactionable puffery); *Kemp v. Universal Am. Fin. Corp.*, No. 05-9883, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007) (statement that the "company is well-positioned to offer the full range of needed products" was puffery).

Plaintiffs argue that investors were misled by statements that the turnaround plan was currently succeeding, including statements that the Company "ha[d] made progress in several of [its] formats and many of [its] initiatives," (Am. Compl. ¶ 97); that the Company was "already experiencing some of the improvements" from the turnaround plan (*id.* ¶ 104); and that the Company was "gaining ground in . . . making prudent reinvestments in [its] business and reducing costs through a process of continuous improvement" (*id.* ¶ 110).  The Court disagrees.  These statements do not identify concrete markers for financial success that the Company had achieved.  Rather, these statements are broad platitudes reflecting an executive's summary opinion that certain (unidentified) areas may be improving.  Such statements do not give rise to liability under Rule 10b-5.  *See Key Equity Investors Inc. v. Sel-Leb Marketing Inc.*, 246 F. App'x 780,

785-86 (3d Cir. 2007) ("[P]rojections about the company's financial growth, or expressions of general optimism about its financial health . . . [are] not actionable under § 10(b)").

Plaintiffs also argue that A&P executives made numerous statements on analyst calls that conveyed false information about the Company's liquidity position.  Plaintiffs are correct that, if a company chooses to answer questions from analysts, it must do so in a non-misleading way.  *See Monk v. Johnson & Johnson*, 2011 U.S. Dist. LEXIS 145554, at *75 (D.N.J. Dec. 19, 2011) (by speaking on a subject in response to an analyst's question, defendant put the topic "into 'play,' thereby creating a duty to disclose" omitted facts); *see also Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) (holding that an affirmative duty to disclose exists when there has been an "inaccurate, incomplete or misleading prior disclosure").  In this case, the Court finds that two of the statements made to analysts were misleading (the Court will refer to these two statements as the "Analyst Statements").

First, the Court finds that Defendant Haub made false statements about A&P's relationship with its vendors ("Vendor Statements").  Plaintiffs allege that, by the summer of 2010, A&P's suppliers, including its primary inventory supplier, C&S, were requiring A&P to pay in cash upon delivery due to concerns about the Company's creditworthiness.  Am. Compl. ¶¶ 6, 70, 132.  On a July 23, 2010 analyst call, Defendant Haub was asked — point blank — if A&P's vendors were nervous about A&P's creditworthiness.  *Id.* ¶ 118.  In response, Haub stated:

> We have regular dialogue with all of our vendors, and that hasn't changed, and we don't foresee any of that changing. They are focused on how they can play a role in the turnaround of the business and how they can build their business, and we communicate to them what we are working on and the progress we are making in the business. And so this has been a very collaborative and supportive ongoing relationship.

*Id.*  Haub's statement that A&P's relationship with its vendors was "very collaborative" and "supportive" was extremely misleading given that C&S and other suppliers were so concerned about the Company's creditworthiness that they were requiring cash upon delivery.  Considering that the Company's liquidity was a prominent source of concern for investors, and that analysts specifically sought information about A&P's vendors, the Court finds it plausible that the omitted information would have been considered material by a reasonable investor.

Second, the Court finds that Defendant Brace made false statements about the A&P's dark store leases ("Dark Stores Statements").  Plaintiffs allege that, in June 2010, the Company stopped making lease payments on many of its dark stores, and had been sued by a multitude of landlords as a result.  Am. Compl. ¶¶ 68-69.  On October 22, 2010, when an analyst explicitly asked about the Company's dark store leases, Defendant Brace stated:

> [W]e have an ongoing program to minimize our dark store
> payments. . . .  Some of it, quite frankly, can be lumpy as we come
> to certain arrangements with our landlords and things like that.  But
> we are focused solely on the cash flow related to that and trying to,
> obviously, minimize any negative cash flow related to dark stores.

*Id.* ¶ 128.  While, in a purely technical sense, it is true that the Company was "minimiz[ing] any negative cash flow related to dark stores," no reasonable investor would understand Brace's statement to mean that the Company had completely stopped paying rent for those stores and was embroiled in numerous lawsuits as a result.  And it is certainly plausible that the Company's lease defaults would have been considered material information to investors given that this may have been one of the first indications that the Company had become insolvent.

Accordingly, with respect to the Company's statements about the turnaround plan, the Court finds that the Vendor Statements and the Dark Stores Statements are actionable. All of the remaining statements are not.

### 3.  Relationship with Yucaipa

Plaintiffs allege that the A&P Defendants made material misrepresentations about the Company's relationship with Yucaipa.  The Court does not reach the question of whether these statements were actionable because, as discussed in detail below, the Court finds that Plaintiffs wholly failed to plead scienter with respect to the Yucaipa relationship.

### ii.  Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)).  Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).  A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Plaintiffs may plead scienter "by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior."  *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009).  Courts may consider motive "along with all the other allegations in the complaint."  *Id.* at 277.  "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.

The Court finds that the Amended Complaint sufficiently alleges scienter with respect to the Goodwill Impairment Charge and the Analyst Statements, but does not allege scienter with respect to statements about the Relationship with Yucaipa.[3]

## 1. Goodwill Impairment Charge

The Amended Complaint sufficiently alleges scienter with respect to the Goodwill Impairment Charge. Indeed, a strong inference of scienter is easily drawn based on the following allegations:

- Pathmark represented a significant portion of A&P's total business (Am. Compl. ¶ 63);
- In the spring of 2009, Pathmark was struggling as A&P discovered numerous hidden liabilities, including stock loss of between $150 million and $160 million per year, (most of which was attributable to Pathmark) and hundreds of millions of dollars worth of pension and vacation liabilities (Am. Compl. ¶¶ 39, 47-48);
- In the spring of 2009, A&P was facing decreased sales and declining profitability throughout its business, in addition to an ever-worsening liquidity crisis, making the Company desperate for capital (Am. Compl. ¶¶ 39, 65, 67);
- On July 23, 2009, A&P announced that Yucaipa was investing $115 million in the Company together with an additional $60 million investment by Tengelmann (Am. Compl. ¶ 40);
- The new investments by Yucaipa and Tengelmann were conditioned upon the completion of the 2015 Notes Offering that could not be completed until August 2009 (Am. Compl. ¶ 40);
- The investments and Notes Offering represented a total of $435 million of additional capital that was critical to the Company's continued operations (Am. Compl. ¶ 67);
- In the summer of 2009, there were numerous indicators that Pathmark's goodwill was severely impaired (Am. Compl. ¶¶ 55-64);
- Recognizing a goodwill impairment charge of $321 million during the summer of 2009 would have jeopardized the 2015 Notes Offering and the other investments (Am. Compl. ¶¶ 57-65);
- A&P did not record *any* impairment for Pathmark for ten months while its $435 million capital infusion was pending (Am. Compl. ¶¶ 55-64); and
- Once the 2015 Notes Offering was completed and the other investments were secured,

---

[3] Defendants argue that Plaintiffs engaged in group pleading by referring to "Defendants" as a single unit, and thus failed to allege scienter with respect to any particular Defendant. This is simply untrue. The Amended Complaint explains how each alleged misstatement is linked to a particular Defendant, either because that misstatement is specifically attributed to that Defendant or because that Defendant signed the SEC filing in question. Thus, Plaintiffs did not engage in group pleading. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 81268, at *15-*16 (D.N.J. Oct. 26, 2006) ("allegations of signing SEC filings are sufficient to bring corresponding allegations outside of the group pleading doctrine").

A&P wrote off the entire amount of Pathmark's goodwill (Am. Compl. ¶ 58).

These allegations, taken as a whole, give rise to a strong inference that Claus, Galgano, and Haub consciously delayed the $321 million impairment so that the Company could secure $435 million of capital that it desperately needed.  *See Avaya*, 564 F.3d at 279 (unusual timing may support an inference of scienter); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) ("At the pleading stage, courts have recognized that allegations of [generally accepted auditing standards] violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss"); *see also Omnicom.*, 2005 WL 735937, at *14 (plaintiffs adequately alleged scienter based on failure to timely recognize an impairment charge in violation of GAAP).  Accordingly, the Court finds that Amended Complaint sufficiently alleges scienter with respect to the Goodwill Impairment Charge.

## 2.  Analyst Statements

The Amended Complaint sufficiently alleges scienter with respect to the Analyst Statements.  Plaintiffs allege that, during the Company's July 23, 2010 conference call, Haub stated that A&P continued to enjoy "a very collaborative and supportive ongoing relationship" with its vendors, even though Haub knew that those relationships had deteriorated to such an extent that C&S and other vendors were demanding that A&P pay in cash upon delivery.  Am. Compl. ¶¶ 6, 70, 118, 132, 141.  Similarly, Plaintiffs allege that Brace told analysts that the Company was "minimiz[ing] any negative cash flow related to dark stores," even though Brace knew the reality that the Company had completely stopped making payments on its dark store leases and had been sued by numerous landlords as a result.  Am. Compl. ¶¶ 6, 68-69, 128, 141.  These allegations give rise to a strong inference that Haub and Brace consciously omitted negative information so that analysts and investors would not know the full extent of the Company's liquidity crisis.  Accordingly, the Court finds that Amended Complaint sufficiently alleges scienter with respect to the Analyst Statements.

## 3.  Relationship with Yucaipa

The Amended Complaint wholly fails to allege scienter with respect to statements about A&P's Relationship with Yucaipa.  Plaintiffs allege that the A&P Defendants "knew or recklessly disregarded [that] the 'partnership' with Yucaipa was anything but a partnership, as Yucaipa was vying for control of A&P," and planned to "steer A&P's eventual Chapter 11 reorganization into a private company."  Am. Compl. ¶ 139.  But the allegations in the Amended Complaint actually give rise to the opposite inference:  that the A&P Defendants had no idea that Yucaipa was vying for control of A&P.  Assuming that it is true that Yucaipa was plotting to take over A&P, there is absolutely no logical reason that the A&P Defendants would act to further that plot.  In fact, the A&P Defendants had every financial and professional incentive to keep A&P out of bankruptcy:  the Amended Complaint alleges that, "during the reorganization, the Company's majority shareholder Tengelmann was ousted, along with A&P's previous executive management, including Defendants Haub and Galgano."  Am. Compl. ¶ 78.

Because Plaintiffs' allegations are more consistent with the inference that the A&P Defendants knew nothing about Yucaipa's alleged takeover plan, the Amended Complaint fails to allege scienter with respect to statements about Yucaipa.

### iii.   Loss Causation

The PSLRA requires a plaintiff to allege that a defendant's act or omission "caused the loss" for which he seeks to recover.  15 U.S.C. §78u-4(b)(4); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) ("In order to satisfy the loss causation requirement . . . the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss").  An allegation that the value of a stock declined following the public announcement of "bad news" does not, by itself, demonstrate loss causation.  *In re Tellium, Inc. Sec. Litig.*, No. 02-5878, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) ("loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud").  Rather, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005).  Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA: all that is required is that plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind," consistent with Rule 8(a).  *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 348 (2005).  The issue of loss causation is usually not resolved on a motion to dismiss.  *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.").

The Court finds that the Amended Complaint sufficiently alleges loss causation with respect to the Goodwill Impairment Charge and the Analyst Statements.  The Court will address each in turn.

### 1.   Goodwill Impairment Charge

Plaintiffs have adequately alleged loss causation with respect to the Goodwill Impairment Charge.  Plaintiffs allege that, on July 23, 2009, there was a 15% increase in A&P's share price as a result of A&P's announcement of the Yupaica and Tengelmann investments and the 2015 Notes Offering.  Am. Compl. ¶¶ 86-92.  Plaintiffs allege that A&P's stock price was artificially inflated at that time because A&P could not have procured the same financing without improperly delaying the $321 million impairment charge.  Plaintiffs allege that, on January 12, 2010, the A&P Defendants announced the impairment charge, and as a result, the price of A&P's common stock plummeted nearly 21%.  Am. Compl. ¶¶ 58, 101, 106, 147.  Plaintiffs allege that the price of A&P stock declined an additional 15% over the next five trading days, as the market digested the import of the impairment charge.  *Id.*  Based on these allegations, Plaintiffs have sufficiently alleged that the January 12, 2010 announcement was a corrective disclosure, and not merely a disclosure of bad news.  Accordingly, the Court finds that Plaintiffs have adequately alleged loss causation with respect to the Goodwill Impairment Charge.

### 2.  Analyst Statements

Plaintiffs have adequately alleged loss causation with respect to the Analyst Statements.  Plaintiffs allege that, in the months leading up to A&P's bankruptcy, the Company severely downplayed its liquidity problems by hiding key information from analysts and investors, such as its dark store lease defaults and its vendors' cash-upon-delivery policy.  Am. Compl. ¶¶ 6, 68-70, 118, 128, 132.  Plaintiffs allege that, on December 10, 2010, investors finally learned of the full extent of A&P's liquidity problems when the Company announced that it was filing for bankruptcy.  Am. Compl. ¶¶ 73, 148.  This news had a devastating effect on A&P stock:  shares of A&P common stock plummeted 67% in a single trading day.  Am. Compl. ¶¶ 134, 149.  Based on these allegations, the Court finds that it is plausible that the pre-bankruptcy price of the stock was inflated, at least in part, because the Company concealed how bad its liquidity position really was.[4]  Because Plaintiffs have sufficiently alleged that Haub and Brace's misstatements and omissions concealed something from the market that, when disclosed, negatively affected the value of the security, the Court finds that Plaintiffs have adequately alleged loss causation with respect to the Analyst Statements.

### iv.  Conclusion

For the reasons set forth above, the A&P Defendants' motion to dismiss Count 1 is **DENIED** with respect to Defendants Claus, Galgano, Haub, and Brace.  The motion to dismiss Count 1 is **GRANTED** with respect to Defendants Marshall and Martin, as they were not responsible for any of the misstatements or omissions identified above.

## B.  The Section 20(a) Claim Against the A&P Defendants

In Count 2, Plaintiffs assert a claim against the A&P Defendants for violations of Section 20(a) of the Exchange Act.  Section 20(a) of the Exchange Act creates a cause of action against individual defendants alleged to have been "control persons" of companies guilty of securities fraud.  Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t.  To state a Section 20(a) claim, a plaintiff "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions."  *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003).[5]

---

[4] At this stage in the proceedings, the Court need not determine how much one factor contributed to a particular drop in stock price.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008) ("Any . . . requirement to ascribe the actual amount of loss to one cause or another does not arise on a motion to dismiss").

[5] "Courts in this Circuit have split over whether culpable participation must be pled in the complaint."  *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 05-232, 2007 WL 81937, at *11 (E.D. Pa. Jan. 9, 2007).  This Court follows the "overwhelming trend in this circuit" by holding

In this case, Plaintiffs have adequately pleaded their Section 20(a) claim against Defendants Claus, Galgano, Haub, and Brace. First, Plaintiffs have adequately alleged a primary violation of Section 10(b) for the reasons set forth above. Second, the Complaint alleges that Claus, Galgano, Haub, and Brace were each high-level officers of A&P during the Class Period who controlled the Company's SEC filings and other public disclosures. *See* Am. Compl. ¶¶ 18, 19, 20, 23, 24, 25, 27. This is sufficient to place them within the meaning of "controlling persons" under Section 20(a). Plaintiffs cannot plead a Section 20(a) claim against Defendants Marshall and Martin because Plaintiffs failed to plead an underlying Section 10(b) claim against these Defendants. Accordingly, the A&P Defendants' motion to dismiss Count 2 is **DENIED** as to Claus, Galgano, Haub, and Brace, and **GRANTED** as to Marshall and Martin.

### C. The Section 10(b) and Section 20(a) Claims Against the Yucaipa Defendants

With respect to the Yucaipa Defendants, Plaintiffs raise two different theories of liability under Rule 10b-5. The Court finds that both theories fail because Plaintiffs failed to allege scienter. Because Plaintiffs failed to state a claim for an underlying Section 10(b) violation, Plaintiffs cannot state a claim under Section 20(a) either.

Plaintiffs arguably raised two different theories of liability under Rule 10b-5 with respect to the Yucaipa Defendants. The Amended Complaint alleges that "Defendants" (defined to include both the A&P Defendants and the Yucaipa Defendants) violated Rule 10b-5 because they "disseminated or approved . . . materially false and misleading statements" and because Plaintiffs were harmed by "Defendants' misleading statements." Am. Compl. ¶¶ 156, 158. Liability for misstatements and omissions arises under Rule 10b-5, subsection (b). The Yucaipa Defendants moved to dismiss, arguing neither Yucaipa nor Burkle made any of the statements identified in the Amended Complaint. In Plaintiffs' opposition brief, Plaintiffs concede that the Yucaipa Defendants are not liable for misstatements under subsection (b) (Opp. Br. at 44), and instead argue that the Yucaipa Defendants are subject to scheme liability under Rule 10b-5, subsections (a) and (c). *Id.* at 44-46. Although the Court finds that the Amended Complaint did not give the Yucaipa Defendants fair notice of a scheme liability claim, this is ultimately irrelevant because the Court finds that Plaintiffs failed to allege scienter under either theory.

A plaintiff asserting a Rule 10b-5 claim must demonstrate scienter under either subsection (b) or subsections (a) and (c). To state a valid claim under Rule 10b-5(b), a

---

that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Id.*; *see also Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996) (A plaintiff "need only plead circumstances establishing control because: (1) the facts establishing culpable participation can only be expected to emerge after discovery; and (2) virtually all of the remaining evidence, should it exist, is usually within the defendants' control").

plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 131 S. Ct. at 1317.  To state a valid claim under Rule 10b-5(a) or (c), a "plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *S.E.C. v. Lucent Technologies, Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009).  Under either subsection, a plaintiff must state facts giving rise to a "strong inference" of scienter, *i.e.*, one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

In this case, the facts alleged do not give rise to a strong inference of scienter; they give rise to an inference of non-fraudulent intent.  Plaintiffs allege that "Yucaipa's $115 million investment in A&P at the start of the Class Period . . . was the first step in Burkle's plan to take over the Company so that he could steer A&P's inevitable Chapter 11 reorganization into a private company run by him." Opp. Br. at 45.  This makes no sense.  Yucaipa and Mr. Burkle would not be motivated to commit a fraud that would destroy $115 million of their own equity.  *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 554 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) (courts assume that a "defendant would act in his or her economic self-interest").  And if their plan was to seek control of A&P through a bankruptcy, Yucaipa and Mr. Burkle could have done so by acquiring securities senior in A&P's capital structure without flushing down the drain $115 million in common stock.  Based on these factual allegations, a far more compelling inference is that Yucaipa sought to assist A&P's turnaround efforts by investing substantial capital, but A&P nevertheless became insolvent.  Thus, the Court finds that Plaintiffs did not, and cannot, plead scienter with respect to the alleged Yucaipa scheme.[6]

Because Plaintiffs have failed to allege a primary violation of Section 10(b), Plaintiffs cannot state a claim under Section 20(a).  *See Jones*, 274 F. Supp. 2d at 645.

Accordingly, the Yucaipa Defendants' motion to dismiss is **GRANTED**, and the claims against Yucaipa are **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

For the reasons stated above, the A&P Defendants' motion to dismiss is **GRANTED** in part, and **DENIED** in part; and the Yucaipa Defendants' motion to dismiss is **GRANTED**.  An appropriate order follows.

---

[6] Plaintiffs' theory of a Yucaipa scheme is further belied by the fact that Yucaipa never gained control of A&P.  After participating in an additional $490 million financing during the bankruptcy, Yucaipa took a minority interest in A&P.  Further, the federal bankruptcy court expressly found that all of the investors' interests in post-bankruptcy A&P were obtained in good faith.

_/s/ William J. Martini_

**WILLIAM J. MARTINI, U.S.D.J.**

**Date: April 30, 2013**